**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| EDWIN RODRIGUEZ | : CONSOLIDATED |
| | : CIVIL NO. 3:01CV 592 (MRK) |
| | :     (lead) |
| V. | : |
| | : |
| THE CITY OF NEW HAVEN, ET AL | : |
| | |
| STEPHEN COPPOLA | : CIVIL NO. 3:01CV 813 (MRK) |
| | :     (member) |
| | : |
| V. | : |
| | : |
| MELVIN WEARING, ET AL | : September 26, 2004 |

**PLAINTIFF COPPOLA'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiff

Stephen Coppola objects to the Motions for Summary Judgment, dated April 30,

2004 and May 13, 2004, filed by the defendants.  Summary judgment is only

proper in a case where there is no genuine issue of material fact.  Because there

are many significant material facts in dispute in this case before this Honorable

Court, this is not one where summary judgment should be granted.  Fed. R. Civ. P.

56(c); Celotex Corp. v. Caltrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

A defendant who seeks summary judgment on a plaintiff's cause of action must

demonstrate the absence of a genuine issue of material fact by either (1)

submitting evidence that negates the existence of a material element of the plaintiff's claim or (2) showing that there is no evidence to support an essential element of the plaintiff's claim. Celotex Corp. v. Caltrett, 477 U.S. 317, 322-25, 106 S.Ct. 2548, 2552-54 (1986). The defendant cannot rely on conclusory statements to establish that the plaintiff has not presented evidence on an essential element of his claim. Id., 477 U.S. at 327, 106 S.Ct. at 2555. Only if the defendant meets its burden is the plaintiff required to respond by submitting proof to show that there is a genuine issue of material fact. Fed. R. Civ. P. 56(e).

In determining whether there is a disputed issue of material fact that precludes granting summary judgment in favor of the defendants, the court must consider all the evidence in the light most favorable to the plaintiff. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993 (1962).

<u>Background</u>

Late in the evening of November 5, 1996 Philip Cusick, while in New Haven, was shot in the stomach. He was subsequently discovered dead on the front lawn of his parents' home on Poole Road in North Haven, CT. A question arose as to whether Philip Cusick was shot and killed in New Haven or North Haven, and since his body was found in North Haven, the North Haven Police Department undertook an investigation into the murder.

The North Haven Police Department was assisted by the New Haven Police Department in the investigation into Philip Cusick's murder. Captain Brian Sullivan, of the New Haven Police Department's Investigative Services Unit, assigned the plaintiff, Stephen Coppola, to assist in the investigation of the murder of Philip Cusick. In February, 1998 the plaintiff, Stephen Coppola, through an informant, learned of the identity of a witness to the Cusick murder and so advised Captain Sullivan who thereupon instructed the plaintiff to proceed with his investigation.

Based on that authority, the plaintiff, Stephen Coppola, interviewed that witness to the murder of Philip Cusick and learned of the identity of three (3) individuals who were at the scene of the Cusick murder. On February 27, 1998 the plaintiff took a taped statement from Reynaldo Martinez, one of those three individuals. That statement contained a detailed account of the circumstances surrounding the Cusick murder, including the identity of the shooter. During the interview Reynaldo Martinez also identified the shooter from a photo board containing photographs which the plaintiff had previously assembled. In accordance with the common practice of the New Haven Police Investigative Services Department, the plaintiff thereafter kept the photo board in his desk for safekeeping.

Following applicable department policy, the plaintiff also signed the taped

statement of Reynaldo Martinez into the Police Department Evidence Locker and requested that the tape be transcribed. Subsequently, at a meeting with Sgt. Derek Rodgers, Captain Brian Sullivan and Sgt. Edward Kendall, the plaintiff made them all aware of the specific content of the Martinez statement and its significance to the Cusick murder investigation.

At that meeting, Captain Sullivan advised the plaintiff to stop his investigation "per order of the Chief." The defendant Wearing contends that it is an undisputed fact that he did not give such an order. However, Bryan Sullivan testified on more than one occasion that Wearing did order the investigation stopped and that he, Sullivan did in fact so advise the plaintiff. Therefore there is a material issue of fact as to whether Chief Wearing gave that order. In accordance with that order the plaintiff ceased working on the Cusick murder investigation. Because the only lead into the Cusick murder up to that point had been generated by the plaintiff, the investigations by both New Haven and North Haven Police Departments ground to a halt even though the identity of the killer was then known.

The plaintiff, Stephen Coppola, knew of no prior instance when a murder investigation was stopped, and he knew of no possible reason to justify terminating his investigation of the Cusick murder. As a result, within two days thereafter the plaintiff reported his concerns to Inspector Dennis Kelly of the Office

of the State's Attorney in New Haven.  Inspector Kelly advised him to continue to follow orders and to obtain and retain copies of all pertinent documentation regarding the Cusick murder.  Keith Wortz also reported a similar conversation he had with Capt. Sullivan to the State's Attorney's Office.  According to Wortz, Capt. Sullivan told him that Chief of Police Nicholas Pastore's wanted to keep the Cusick homicide from "coming back to New Haven."  According to Wortz, Capt. Sullivan warned him not to take any further action regarding the Cusick homicide or he would no longer be a New Haven Police Officer.  Wortz testified that when he notified the Assistant State's Attorney who instructed him to inform the Chief of Police.  Wortz testified that he voiced his concerns to the defendant Wearing regarding the discontinuance of the Cusick murder investigation, the defendant Wearing told him that "I (Wearing) was fully aware of everything" and then "stay the fuck out of my office, do your job and only your job, the job we assigned you to."

When the plaintiff, Stephen Coppola later attempted to retrieve the tape and the original transcript of the Reynaldo Martinez statement, he discovered that both were missing from the evidence locker. He subsequently became aware that both the tape and the original transcript were in the locked desk drawer of Sgt. Edward Kendall who told the plaintiff that he had the original statement delivered to him because he wanted to review it. The plaintiff obtained the original transcript from

Kendall, made two copies of the transcribed statement of Reynaldo Martinez, placed them in his desk drawer and returned the original transcribed statement to Sgt. Kendall.

Subsequently, the plaintiff was interviewed and gave a statement to Inspector Tim Reardon of the Office of the State's Attorney in New Haven of his involvement in the Cusick murder investigation. The New Haven State's Attorney, Michael Dearington, later summoned the defendant Wearing to his office and expressed his concerns regarding the termination of the Cusick homicide investigation. Within days of this meeting, the defendant Wearing commenced an "Internal Affairs" investigation with the intent to deflect criticism of his own involvement and place the blame for the discontinuance of the Cusick murder investigation on the plaintiff. The defendant Wearing, who was then already under scrutiny by the local media for alleged cover-ups and systemic problems within the department, selected the defendant Kearney and John Minardi, an officer who was not then even assigned to Internal Values and Ethics, to conduct that internal investigation. That investigation was designed to find that the plaintiff was at fault and to present a false image to the community and the State's Attorney that there were no systemic problems within the New Haven Police Department and Chief Melvin Wearing was in control. Both John Minardi and the defendant Wearing stated, during their respective depositions, that an internal investigation is limited

to alleged violations of departmental policy and is not designed or authorized to probe into criminal charges.  Whenever a possible crime is uncovered during an internal investigation, that departmental policy requires the investigating officer to refer them to the State's Attorney's Office.

The defendant Wearing interfered in the investigation of Kearney and Minardi by allowing Bryan Sullivan to change his sworn statement, dictating the order of people to be interviewed and demanding to review their statements before he himself would give a statement.  Even after he was implicated in the investigation, he continued to receive updates and reports from the defendant Kearney.  After vigorously protesting Chief Wearing's interference, John Mindardi was removed and reassigned by the defendant Wearing four months before the investigation officially ended and a final report was submitted.

Minardi testified in his deposition that he was not surprised to hear that the defendant Wearing allegedly stopped the Cusick homicide investigation because of an earlier, similar situation wherein Minardi, then in Internal Affairs, was prevented by Wearing from pursuing an internal investigation of a Police Captain who was suspected of selling items that had been logged into the evidence locker. At that time Minardi, an experienced detective and investigator, testified that he went to the State's Attorney's Office to report this incident and was later reassigned thereafter by Wearing.  The defendant Wearing, according to Minardi,

used to say "After the politicians are gone, you still work for me."  According to Minardi, he felt compelled to go outside the department because since it was the Chief of Police who prevented the investigation, and there was no one with superior authority within the Department to whom he could complain.  Minardi believes that because he went outside the department to the State's Attorney, he has not been assigned to positions within the department for which he is qualified and which he desires.

During this internal investigation, the defendant Wearing placed Capt. Bryan Sullivan and Lt. Edward Kendall on paid administrative leave, and subsequently did not oppose their applications for retirement.  Once Sullivan and Kendall had retired, the Police Department was precluded from investigating any alleged violations of department policy that they might have committed.

At the conclusion of his investigation, the defendant Kearney prepared and submitted a sixty-nine (69) page report to the defendant Wearing.  That report made specific "Findings of Fact" which accused the plaintiff, Stephen Coppola, of engaging in <u>criminal activity</u> in connection with the Cusick murder investigation, to wit:

a. "Detective Coppola did not notify the chief, assistant chief, Internal Values & Ethics, North Haven Police that this investigation was stopped...

b. Detective Coppola withheld evidence from the North Haven Police

Department in the form of statements and photo boards...

     c. Detective Coppola physically withheld copies of the Martinez statement and the original photo boards, in his desk, from the North Haven Police and discovery for more than two years... Withholding evidence is illegal in the State of Connecticut."

     The defendant Kearney exceeded the scope of his authority and the scope of the investigation by accusing the plaintiff Coppola of a crime. However, no criminal charges against the plaintiff Coppola were ever referred to the State's Attorney's Office. The defendant Kearney concludes that the order from the defendant Wearing to the plaintiff Stephen Coppola, through Bryan Sullivan was an illegal order that should not have been obeyed. Yet, the State's Attorney, Michael Dearington wrote in a letter, dated November 30, 2000 that "there may have been legitimate reasons for the order."

     A Grand Jury, convened to hear criminal charges regarding the Cusick homicide investigation found prior to the date of the defendant Kearney's Final Report, that the plaintiff Coppola did not engage in any wrongdoing. Although the defendant Kearney was aware of the Grand Jury's findings, he submitted such conclusions even though they contradicted such findings.

     The defendant Kearney received a copy of a January 4, 2001 letter from the City of New Haven's Chief Administrative Officer, to the Mayor, recommending

that the plaintiff be disciplined for not reporting to anyone within the department his concerns about the order terminating the Cusick murder investigation.  That same letter also recommended that Keith Wortz receive a letter of commendation for reporting his concerns regarding the Cusick murder investigation to the State's Attorney.  It is noteworthy that Wortz testified in his deposition that he did not report his conversation with Sullivan to anyone within the department.

On January 11, 2001 the defendant Wearing, speaking of the investigation into the murder of Philip Cusick, told a reporter for "The New Haven Register" that "it appears that Coppola violated department rules."  On January 12, 2001 a written Press Release was distributed to the New Haven area print and media outlets, by and with the approval of the defendant Wearing which announced his intent to discipline the plaintiff, Stephen Coppola, by way of a written reprimand "for violating a departmental General Order concerning the possession of evidence, as well as department rules of conduct concerning the reporting of unlawful activity and the withholding of evidence."  In the January 13, 2001 edition of "The New Haven Register," the defendant Wearing repeated his earlier contention that the plaintiff, Stephen Coppola, should be reprimanded because the plaintiff allegedly violated department General Orders by withholding evidence from the North Haven Police Department.  The defendant Wearing admits that he made these statements but asserts a privilege and that the statements were true.

Purportedly in reliance upon the "Findings of Fact," the defendant Wearing summoned the plaintiff, Stephen Coppola, to his office on January 15, 2001 and formally issued a written reprimand to the plaintiff, Stephen Coppola, for his alleged "violation of departmental rules governing the withholding of evidence and the obligation to report "any information he has concerning the violation of any law or ordinance or any matter that should come to the attention of the department." That written reprimand was distributed to the President of the New Haven Board of Police Commissioners and the Assistant Chief of the New Haven Police Department, among others, and a copy was placed in the plaintiff's personnel file. The reprimand had already been announced and published in the local media for days before it was officially issued to Coppola. The letter of reprimand does not state that the plaintiff failed to report any unlawful activity as previously stated by the defendant Wearing. It is also noteworthy that the letter of reprimand bears the language "DO NOT READ OR POST."

The defendant Wearing purposely chose to issue a letter of reprimand rather than referring the charges against Coppola to the Board of Police Commissioners. If the charges had been presented to the Board of Police Commissioners, the plaintiff would have had the benefit of a full hearing wherein he could contest the charges against him, confront and cross-examine witnesses and present evidence in his defense. By failing to present the charges against the

plaintiff to the Board of Police Commissioners, the defendant Wearing intentionally precluded him from all such benefits.  On the other hand, Keith Wortz was presented with a letter of commendation for reporting the halting of the Cusick homicide investigation to the North Haven Police Department and the State's Attorney's Office.

In 2003, the killer of Philip Cusick was brought to trial and found guilty.  The evidence used for the arrest warrant and trial was the photoboard and transcript that the plaintiff had kept in his desk in accordance with the State's Attorney's directions.  The taped statement of Martinez, taken by Lt. Edward Kendall, was never recovered.  After receiving the letter of reprimand the plaintiff was later assigned to the "cold case files" which involve old homicides that remain unsolved.

I.  The plaintiff's causes of action

The plaintiff originally brought this action in state court seeking redress for the deprivations of his constitutional rights as well damages for common law defamation.

## A. FIRST AMENDMENT VIOLATIONS

A public employee challenging discipline imposed because of his speech "must initially demonstrate...that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so

that it can be said that his speech was a motivating factor in the determination."

Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999); Hale v. Mann, 219 F.3d 61, 70 (2d Cir. 2000); Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000).

I. *Threshold Inquiry:  "Matters of Public Concern"*

The essential issue is whether the plaintiff's speech was protected by the First Amendment, i.e. a matter of public concern.  The defendants concede that the plaintiff, Stephen Coppola's statements to the State's Attorney were and are protected speech.  See Joint Motion for Summary Judgment, pp. --.  The discipline of a municipal employee for reporting possibly criminal wrongdoing in his agency to the FBI or other officials has been held actionable under Section 1983 as a First Amendment violation.  Dobosz v. Walsh, 892 F.2d 1135, 1141-42 (2d Cir. 1989); Vasbinder v. Ambach, 926 F.2d 1333 (2d Cir. 1991); Robinson v. Balogh, 160 F.3d 183 (4th Cir. 1998); Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. 1996); Gorman v. Robinson, 977 F.2d 350 (7th Cir. 1992); Hafley v. Lohman, 90 F.3d 264 (8th Cir. 1996); Cooper v. Smith, 89 F.3d 761 (11th Cir. 1996); Fikes v. City of Daphne, 79 F.3d 1079 (11th Cir. 1996).

II. *Adverse employment action*

The defendants concede that the defendant Wearing's letter of reprimand to the plaintiff, Stephen Coppola was an adverse employment action. See Joint

Motion for Summary Judgment, pp. ---; and Morris v. Lindau, 196 F.3d 102 (2d Cir.1999).

III. *Causation Inquiry*

  The defendants do not concede that Coppola's exercise of his right to speak to the State's Attorney about his concerns regarding the actions of his superiors was a substantial motivating factor in the decision to reprimand him. See  Mount Healthy City School District Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  The burden of proof analysis of Mount Healthy was applied in a Second Circuit decision, Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency, 77 F.3d 26 (2d Cir.1996) and should therefore control in the resolution of this case.  Under the burden of proof analysis stated in Mount Healthy, the plaintiff Coppola must establish that the reason offered by the defendants for his reprimand were pretextual and the actual reason was in retaliation for his speech.

  On or about April 28, 2000 the defendant, Bryan Kearney stated to the plaintiff, Stephen Coppola, in the presence of John Valleca: "You wouldn't be in all this trouble if you hadn't gone to the State's Attorney's Office."  See Plaintiff's Affidavit, pp.-- .  But retaliatory motive is rarely proven by direct evidence. Housing Works, Inc. v. City of New York, 72 F.Supp.2d 402, 422 (S.D.N.Y.1999), *appeal dismissed,* 203 F.3d 176 (2d Cir.2000).

Applying the reasoning of Jim Causley v. N.L.R.B., 620 F.2d 122, 125 (6th Cir. 1980); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980); Lewis Grocer Co. v. Holloway, 874 F.2d 1008 (5th Cir. 1989), the following have been relied upon as grounds for a sufficient inference of a retaliatory or improper motive:

(1) Disparate treatment, particularly unequal discipline among employees or individuals. Abasiekong v. City of Shelby, 744 F.2d 1055 (4th Cir. 1984). See generally Krieger v. Gold, 863 F.2d 1091 (2nd Cir. 1988); Ramsuer v. Chase, 865 F.2d 460 (2nd Cir. 1989). Exhibit X, letter from Horan to Kearney.

(2) Inadequate investigation into allegations surrounding the adverse action. Exhibit XX. Minardi deposition.

(3) Failing to review and consider all facts purportedly in the individual's favor. See Martinez v. El Paso, 710 F.2d 1102, 1104 (5th Cir. 1983).

(4) Deviations from routine procedures. Exhibit XX. Wearing deposition.

(5) Investigation or scrutiny of employee's conduct following protected conduct. The defendant Wearing initiated an internal investigation within days of his meeting with the State's Attorney Michael Dearington.

(6) Criticizing the employee for a problem created by the employer. The defendant Wearing's alleged order to stop the Cusick homicide investigation created a public scandal for which he sought to find someone

else at fault.

(7) Pretextual basis for the employer's adverse actions.  The defendant Wearing issued a Letter of reprimand that gives credit to the plaintiff for reporting concerns to the State's Attorney.

(8) The Defendant's failure to adhere to its own procedural or substantive regulations. See Vitarelli v. Seaton, 359 U.S. 535, 546 (1959) (Frankfurter concurring); Service v. Dulles, 354 U.S. 363 (1957).  The defendant Wearing did not refer this "serious offense" to the Board of Police Commissioners although he testified that all serious offenses are referred to the Board of Police Commissioners.  Wearing transcript.  Exhibit XX.

Even if the plaintiff establishes the inference of improper or retaliatory motive the defendants can still avoid liability if they persuade the jury that they would have nevertheless reprimanded the plaintiff.  In the plaintiff Coppola's affidavit he states that he is not aware of any other detective who was disciplined for failing to put evidence into the evidence locker.  He also has proof that a top-level officer within the department kept original, taped witness statements regarding unsolved homicides in his office for over nine (9) years.  When such statements were finally entered into the evidence locker, no internal investigation was conducted or discipline administered to the guilty party.  Essentially, while there is a policy requiring evidence to be entered into the department's evidence

locker, that policy was neither enforced nor uniformly followed and detectives routinely kept evidence in their desks for safekeeping.  See Exhibit XX.

IV. *The Pickering Balancing of Interests does not apply*

The defendants Wearing, Kearney and the City of New Haven bear the burden of demonstrating that Coppola's speech threatened to interfere with police department operations. Heil v. Santoro, 147 F.3d 103, 109 (2d Cir.1998). To justify disciplinary action on this basis, they must demonstrate that (1) their prediction of disruption was reasonable; (2) the potential disruptiveness outweighs the value of the speech; and (3) they took action against the employee based on this disruption and not in retaliation for the speech. Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.1995).

The defendants City of New Haven, Bryan Kearney and Melvin Wearing have not offered any evidence to sustain that burden of proof.  Therefore the Pickering-balancing test is not applicable.  If the government asserts that it had legitimate reasons to take action against the plaintiff because of his speech it must present actual evidence of the adverse effect of that speech.  See Belk v. City of Eldon, 228 F.3d 872 (8th Cir. 2000) (insufficient evidence of disruption; no Pickering instructions to jury required); Sexton v. Martin, 210 F.3d 905 (8th Cir. 2000) (no evidence of adverse effect presented).

Removing the Pickering balancing test from the argument before this Court,

the plaintiff, Stephen Coppola has established a *prima facie* case of First

Amendment retaliation, and the issue of whether or not his protected speech was

a substantial, motivating factor in the adverse employment action which was taken

against him is a matter of fact for a jury to decide.  The defendants are not entitled

to summary judgment in their favor with respect to the plaintiff's claim of First

Amendment retaliation.

   The defendants' argument that they are entitled to immunities afforded to

military personnel is entertaining, yet untenable.  While a police department is a

quasi-military organization, its members are unquestionably actors under color of

law for purposes of constitutional deprivations.  Public institutions such as law

enforcement, schools, hospitals, nursing homes, prison assistants, and coroners

have been considered state actors since Flagg Bros., Inc. v. Brooks, 436 U.S. 149

(1978).  The plaintiff is not aware of any precedent that would treat police officers

as military personnel.


## B. FOURTEENTH AMENDMENT

   "There are two theories under which a plaintiff may bring a substantive due

process claim. Under the first, a plaintiff must demonstrate a deprivation of an

identified liberty or property interest protected by the Fourteenth Amendment.

Under the second, a plaintiff is not required to prove the deprivation of a specific

liberty or property interest, but, rather, he must prove that the state's conduct 'shocks the conscience.'" [citing Brown v. Hot, Sexy & Safer Productions, Inc., 68 F.3d 525, 531 (1st Cir.1995)]); Hawkins v. Freeman, 195 F.3d 732, 738, 739, 741, 750 (4th Cir. 1999) (en banc) "Depending upon whether the claimed violation is by executive act or legislative enactment, different methods of judicial analysis are appropriate... This is so because there are different 'criteria' for determining whether executive acts and legislative enactments are 'fatally arbitrary,' which is an essential element of any substantive due process claim…." Id.

When the claimed arbitrary act is by executive act, the issue of fatal arbitrariness must be addressed as a "threshold question," asking whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  If it does not meet that test, the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest. If it does meet that threshold test of culpability, inquiry must then turn to the nature of the asserted interest, that is the level of protection to which it is entitled. County of Sacramento v. Lewis, 523 U.S. 833 (1998), The Supreme Court in Lewis did not settle the question of who makes the determination of "conscience-shocking." See, e.g., Moran v. Clarke, No. 00-1015, 2002 WL 1446740, at *5 (8th Cir. July 5, 2002) (en banc) "[W]hether the plaintiff has

19

presented sufficient evidence to support a claimed violation of a substantive due

process right is a question for the fact-finder, here the jury."


1.  The defendants denied the plaintiff his rights to due process.

"The fundamental requisite of due process of law is the opportunity to be

heard." Grammis v. Ordean, 234 U.S. 385, 394 (1914). Due process not only

requires that the party be entitled to present his side of the story, but also requires

"that the agency be willing to listen."   The plaintiff, Stephen Coppola, was

deprived of his right to be heard by a body such as the New Haven Board of Police

Commissioners which has supervisory authority over the Chief of Police and

where he would have been entitled to a full hearing wherein he would have had

the right contest the charges against him, confront and cross-examine witnesses

and present evidence in his defense.

"Governmental action or punishment less than firing (transfer, demotion,

reassignment, failure to promote, termination of volunteer) because of, or in

retaliation for, the exercise of First Amendment free speech rights or associational

rights is also liberty deprivation," Rutan v. Republican Party of Illinois, 497 U.S. 62,

76 n.8 (1990).  Public employees who suffer adverse employment actions as a

result of their exercise of First Amendment rights have lost "liberty" without due

process of law, Pickering v. Bd. of Education, 391 U.S. 563 (1968).  The question

of whether a procedural due process violation occurred is a jury question, Davis v. West Community Hosp., 755 F.2d 455 (5th Cir. 1985).

The plaintiff, Coppola was charged with violations of department policy that were "serious offenses." See defendant Wearing deposition, Exhibit XX. Departmental policy requires that serious offenses be referred to the Board of Police Commissioners.  See defendant Wearing deposition, Exhibit XX.  The charges against Coppola were not referred to Board of Police Commissioners. Charges referred to the Board of Police Commissioners require a full hearing.  The defendant Wearing issued a letter of reprimand rather than referring the charges against the plaintiff to the Board of Police Commissioners in order to keep control of those charges and to discipline the plaintiff without providing him the right to a hearing.  According to the Collective Bargaining Agreement between the City of New Haven and the New Haven Police Union (marked as defendants' Exhibit G), page 6, section 3 provides:

> "The Chief shall have the power to suspend, without pay, any
> employee, provided, however, that no such suspension shall
> be continued for a period of more than fifteen (15) days without
> affirmative action of the Board of Police Commissioner, which
> actions shall not be taken until after a hearing upon charges preferred
> in writing."

Section 4 provides: "Discipline other than that described in Section 3 shall

be *awarded only by the Board of Police Commissioners* after notice

to the employee, a hearing and finding of just cause." (Emphasis added).

The plaintiff Coppola was deprived of his rights to contest the charges; confront

and cross-examine witnesses; and/or offer evidence on his own behalf.  In fact, his

discipline was broadcast to the media before it was actually imposed.

The defendant Wearing's efforts to change the focus of the State's Attorney

and local media from himself, as a result of his mismanagement and

discontinuance of the Cusick murder investigation, coupled with his manipulation

of the internal affairs investigation and disciplinary process which resulted in an

unwarranted, adverse employment action against the plaintiff, is behavior that

"shocks the conscience."


2.  The defendants denied the plaintiff his rights to equal protection.

"The purpose of the equal protection clause of the Fourteenth Amendment

is to secure every person within the State's jurisdiction against intentional and

arbitrary discrimination, whether occasioned by express terms of a statute or by its

improper execution through duly constituted agents." Village of Willowbrook v.

Olech, 528 U.S. 562, 120 S. Ct. 1073, 1074-75 (2000). Citing Sioux City Bridge

Co. v. Dakota County, 260 U.S. 441 (1923); Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 340, 352 (1918).

If the government acts arbitrarily with respect to a class of one, there can be an equal protection violation.  See Willowbrook v. Olech, 120 S.Ct. 1073 (2000). Selective enforcement of the laws can supply the basis for Section 1983 litigation either on an equal protection basis, or based upon improper motivation (such as punishment for the exercise of protected speech) for the unequal treatment involved. The Second Circuit has repeatedly and consistently reaffirmed its acknowledgement of this cause of action and in particular to the view that treating a person differently from others similarly situated solely because of a "malicious or bad faith intent to injure the person" is an equal protection violation actionable under Section 1983. Crowley v. Courville, 76 F.3d 47, 52-53 (2d Cir. 1996); Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995); LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester, 40 F.3d 587 (2d Cir. 1994); Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1352 (2d Cir. 1994); FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992). See also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992).  Clearly, the City of New Haven, acting through its Chief Administrative Officer and the defendant Wearing, disciplined the plaintiff Coppola for certain conduct for which it commended Keith Wortz.  See Horan

letter to defendant Kearney, Exhibit XX.  The disparate treatment and selective enforcement of the police department's policies are blatantly obvious.

C. COMMON LAW DEFAMATION

The plaintiff Stephen Coppola asserts common law claims of defamation against the defendants, City of New Haven, Wearing and Kearney.  In Connecticut, libel per se is a libel the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of actual damages.  D. Wright & J. Fitzgerald, Connecticut Law of Torts (2d Ed.) 146.  The defendants published accusations of criminal conduct attributable to the plaintiff, and they were not privileged to do so.  The internal investigation, ordered by the defendant Wearing  and conducted by the defendant Kearney, was limited to determining whether any departmental policies were violated.  Yet, in his final report the defendant Kearney accused the plaintiff of criminal conduct when he was neither authorized nor empowered to do so, and the defendant Wearing proceeded to discipline the plaintiff based upon that accusation.  An accusation of a crime that the Grand Jury considered and rejected.

The defendants City of New Haven and Wearing defamed the plaintiff Coppola by issuing statements that portrayed him in a false light.  The statements made to the media did not mention that the departmental policy the plaintiff Coppola failed to follow was one that was neither enforced nor uniformly followed.

The press releases and statements by the defendants Wearing and Kearney revealed disciplinary action before it was imposed and cast the plaintiff in a false light as well as invading his privacy.

A cause of action for invasion of privacy was first recognized by the Connecticut Supreme Court in *Goodrich v. Waterbury Republican American, Inc., 188 Conn. 107, 438 A.2d 1317 (1982)*. The court adopted the definitions and the four categories of invasion of privacy which are set forth in 3 Restatement (Second), Torts 652A: "(a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public."

The comment to 3 Restatement (Second) Torts, § 652D, provides that publicity, as distinct from publication in defamation law, "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge ... it is not an invasion of privacy ... to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons ..." Id.

In order to establish invasion of privacy by false light, the plaintiff must show "(a) the false light in which the other was placed would be highly offensive to a

reasonable person, and (b) the actor had knowledge of or acted in reckless

disregard as to the falsity of the publicized matter and the false light in which the

other would be placed." Restatement (Second), Torts 652E; see *Goodrich v.*

*Waterbury Republican American, Inc., supra.*

"Invasion of privacy protects one's interest in not being placed before the

public in an objectionable false light or false position, 'or in other words,

otherwise than as he is.'  Restatement (Second), Torts, 652E, comment b. The

essence of a false light privacy claim is that the matter published concerning the

plaintiff (1) is not true; *id.;* and (2) is such a "major misrepresentation of his

character, history, activities or beliefs that serious offense may reasonably be

expected to be taken by a reasonable man in his position." *Id.,* comment c.

*Goodrich v. Waterbury Republican American, Inc., supra,* 131; *Jonap v. Silver,*

*supra* at 558.

Comment (c) of § 652D recognizes, however, that not all personal and

private information is protected from public disclosure. The rule stated in §  652D

gives protection only against unreasonable publicity, of a kind highly offensive to

the ordinary reasonable person. *Perkins v. Freedom of Information Commission,*

*228 Conn. 158, 172, 635 A.2d 783 (1993). Tarka v. Filipovich, 45 Conn.App. 46,*

*53, 694 A.2d 824 (1997).*

The plaintiff Coppola was not and has not been charged with any crimes;

the Grand Jury concluded that he did not engage in any wrongdoing but the

defendant Kearney stated that he had committed a crime.  "Withholding evidence"

is within the scope of Connecticut General Statues § 53a-165 "Hindering

prosecution."  Subsection (5) states: "suppresses, by an act of concealment,

alteration or destruction, any physical evidence which might aid in the discovery or

apprehension of such person or in the lodging of a criminal charge against him.  A

person is guilty of hindering prosecution in the first degree when he renders

criminal assistance to a person who has committed a class A or class B felony or

an unclassified offense for which the maximum penalty is imprisonment for more

than ten years.  Hindering prosecution is a felony.

The defendant Kearney refers to Grand Jury findings and conclusions in his

sixty-nine page Final Report.  Therefore he knew of the false light into which he

thrust the plaintiff Coppola.  The defendants Wearing and Kearney did not indicate

anywhere in their published statements that when the plaintiff, Stephen Coppola,

placed the photoboard and the copy of the transcript into his desk, he was: (a)

acting in accordance with common practices within the New Haven Police

Department and (b) acting as he was instructed to do by members of the State's

Attorney's Office.

The defendants made major misrepresentations of the plaintiff's character

and activities such that serious offense may reasonably have been expected to be

taken by a reasonable man in his position.  In any event, this is certainly a question for a jury to decide.

II.  The defendants' claim of qualified immunity

When qualified immunity is asserted as a defense, the court must first determine if the complaint states a violation of federally protected rights. Saucier v. Katz, 121 S.Ct. 2151 (2001); Wilson v. Layne, 119 S.Ct. 1692 (1999); Conn v. Gabbert, 119 S.Ct. 1292 (1999); County of Sacramento v. Lewis, 523 U.S. 833 (1998); Siegert v. Gilley, 500 U.S. 226 (1991).
The Supreme Court explained that this approach is preferable because if qualified immunity is always taken up first, it is hard for constitutional standards to develop. "Deciding the constitutional question before addressing the qualified immunity question... promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 119 S.Ct. at 1697. See also Saucier v. Katz,  121 S.Ct. 2151 (2001)  Nevertheless, some circuit courts occasionally prefer to reach the immunity issue first. See, e.g. Horne v. Coughlin, 178 F.3d 603 (2d Cir. 1999).    The test is one of "objective reasonableness" which determines if an official who violated clearly established federal law failed to act in an objectively reasonable manner.  The official's subjective motivation is irrelevant to the qualified immunity defense but may be

28

relevant to the constitutional claim asserted, Crawford-El v. Britton, 118 S.Ct 1584 (1998).

Normally, a controlling precedent of either the United States Supreme Court, the particular circuit, or the highest court in the state is necessary to clearly establish the federal law. Wilson v. Layne, *supra*. For federal law to be clearly established, there must be a fairly close factual correlation between the prior precedents and the case at hand. Anderson v. Creighton, *supra*. The defendants rely upon Pickering v. Bd. of Education, 391 U.S. 563 (1968) for their First Amendment argument. The Supreme Court decided Pickering some thirty-six years ago and the balancing test described therein has been applied for at least twenty years. It is therefore reasonable to infer that a public employee's rights with respect to free speech and to be free from retaliation as a result thereof were clearly established in January of 2000.

There is a potential tension between a constitutional claim, e.g., a free speech retaliation claim, which implicates the defendant's subjective intent, and qualified immunity, which requires an objective reasonableness standard pursuant to which the defendant's intent is irrelevant. In these cases courts should follow the Federal Rules of Civil Procedure and not place special burdens on plaintiffs who are faced with summary judgment motions based upon claims of qualified immunity. Crawford-El v. Britton, 118 S.Ct. 1584 (1988).

The defendants City of New Haven, Wearing and Kearney are not entitled to assert the defense of qualified immunity because a government official is not immune from liability "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff," Scheuer v. Rhodes, 416 U.S 232 (1974); Wood v. Strickland, 420 U.S. 308, 322 (1975); O'Connor v. Donaldson, 422 U.S. 563 (1975); Harlow v. Fitzgerald, 457 U.S. 800 (1982) and Anderson v. Creighton, 483 U.S. 635 (1987).  Since qualified immunity is an affirmative defense, a governmental defendant must generally plead and prove good faith, Gomez v. Toledo, 446 U.S. 635 (1980).  A governmental unit may not take advantage of a good faith defense even if one would be available to the individual official, Owen v. City of Independence, 445 U.S. 622 (1980). See also Garner v. Memphis Police Dept., 710 F.2d 240 (6th Cir. 1983) affirmed sub nom. Tennessee v. Garner, 471 U.S. 1 (1985) (city has no good faith defense possible in following state law permitting deadly force against unarmed fleeing felon which law was found unconstitutional).

The Supreme Court held that Section 1983 was broad in language and purpose and therefore immunities should not be readily incorporated as defenses. While judicial or legislative immunity was firmly rooted in the common law, municipal immunity was not.  There is no tradition of immunity for municipal

corporations, and neither history nor policy support a construction of Section 1983 that would justify qualified immunity.  Discretionary function justification cannot apply to a municipality, it has no 'discretion' to violate the Federal Constitution, its dictates are absolute and imperative.

Since Section 1983 was designed to protect against misuse of power by those acting under color of state law, the purpose would be defeated by a good faith defense by a governmental entity. A damage remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, many victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense.  Section 1983 was also intended to serve as a deterrent against future constitutional deprivations.

Imposing liability on a city for acts of its officers acts as an incentive to "err on the side of protecting citizens' constitutional rights." Those officials in a policymaking position would institute rules and regulations to minimize the likelihood of unintentional infringements on constitutional rights.  A suit against government officials in their official capacity is treated as a suit against an entity, and no good faith defense is possible, Universal Amusement Co. v. Hofheinz, 646 F.2d 996 (5th Cir. 1981); Calkins v. Blum, 675 F.2d 44 (2d Cir. 1982)(same). See also Brandon v. Holt, 469 U.S. 464 (1985); Moore v. Morgan, 922 F.2d 1553 (11th

Cir. 1991) (official capacity suit; governmental entity not entitled to qualified immunity).

III.  <u>CONCLUSION</u>

The defendants have not offered any proof that the plaintiff's speech created an adverse effect or disruption in the workplace.  Therefore, <u>Pickering</u> is inapplicable.  The plaintiff has established a *prima facie* cases of First Amendment retaliation, deprivations of due process and equal protection, and defamation.  The issues that a trier of fact must decide are the defendants' motives for retaliation; denial of due process and equal protection, and whether a reasonable person would take serious offense to allegations of criminal conduct and obstructing a murder investigation against a homicide detective.  The defendants' Motions for Summary Judgment must fail because genuine issues of material fact do exist and essential facts are in dispute.  The defendants are not entitled to qualified immunity.

Wherefore, the plaintiff, Stephen Coppola, respectfully asks this Honorable Court to deny the defendants' Motions for Summary Judgment.

THE PLAINTIFF
STEPHEN COPPOLA

By: _____
R. Edward Phillips, Esquire
One Union Plaza, Second Floor
New London, CT  06320
(860) 444-0437
# CT20999


**<u>CERTIFICATION</u>**

This is to certify that a copy of the foregoing was mailed, on September 26, 2004 to:

Jonathan Beamon, Esquire
Office of the Corporation Counsel
City of New Haven
165 Church Street
New Haven, CT 06510

Rene Gerard Martineau, Esquire
Del Sole & Del Sole, LLP
46 South Whittlesey Avenue
P.O. Box 310
Wallingford, CT 06492

Rosemaire Paine, Esqurie
350 Orange Street
P.O. Box 606
New Haven, CT 06503

_____
R. Edward Phillips, Esquire