UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDWIN RODRIGUEZ, | : |
|     Plaintiff | : |
| | : |
| vs. | : |
| | : |
| THE CITY OF NEW HAVEN, AND IN THEIR | : |
| INDIVIDUAL AND OFFICIAL CAPACITIES, | : CONSOLIDATED |
| MAYOR JOHN DESTEFANO, CHIEF OF POLICE | : NO.301 CV592(MRK)(Lead) |
| MELVIN H. WEARING, CORPORATION COUNSEL | : NO.: 3:01 CV813(MRK)(Member) |
| THAYER BALDWIN, CHIEF ADMINISTRATIVE | : |
| OFFICER JAMS HORAN, CAPTAIN BRYAN D. KEARNEY, | : |
| LIEUTENANT JOHN MINARDI, PATROL OFFICER | : |
| KEITH WORTZ, | : |
|     Defendants | : |
| | : |
| STEPHEN COPPOLA, | : |
|     Plaintiff | : |
| | : |
| vs. | : |
| | : |
| MELVIN WEARING, BRYAN KEARNEY, | : |
| JOHN MINARDI AND KEITH WORTZ AND | : |
| THE CITY OF NEW HAVEN | : OCTOBER 8, 2004 |

**PLAINTIFF RODRIGUEZ' OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

I.    <u>Introduction.</u>

Defendants move for summary judgment, claiming in essence that there is no

dispute as to whether they retaliated against plaintiffs for exercise of their First Amendment

rights.  Summary judgment must be denied as to the City and defendants Wearing and

Kearney because there is a genuine issue of material fact as to whether these defendants retaliated against plaintiffs for voicing their concerns to the State's Attorney's office.[1]

Under separate cover, plaintiff has today filed his Local Rule 56(a)(2) statement  and a Notice of Filing Exhibits with attached exhibits.

**II.    Procedural Background.**

Plaintiff Rodriguez brought this action by complaint dated April 11, 2001.  The Complaint names as defendants the City of New Haven, and, in both their individual and official capacities, Mayor John DiStefano, Police Chief Melvin Wearing, Corporation Counsel Thayer Baldwin, Chief Administrative Officer James Horan (collectively "the City defendants"), and Police Captain Bryan Kearney, Lieutenant John Minardi, and Officer Keith Wortz (collectively "the Kearney defendants").  The Complaint sounds in four counts: violation of 42 U.S.C. § 1983 as to the individual defendants, violation of 42 U.S.C. § 1983 as to the City of New Haven, intentional infliction of emotional distress as to the individual defendants, and violation of Connecticut General Statutes sections §§ 31-51m and 31-51q as to the City of New Haven.

**III.    Statement of Disputed and Undisputed Facts.**

**A.    Overview.**

In 1997, Detectives Edwin Rodriguez and Stephen Coppola developed a lead in the investigation of Philip Cusick's murder.  (City Defs. 56(a)(1) statement ¶¶ 5-9.) The partners identified a possible witness to the murder, Reynaldo Martinez.  (Id. ¶¶

---

[1]  Plaintiff Rodriguez hereby accedes in part to the granting of summary judgment as to defendants DiStefano, Baldwin, Horan, Minardi and Wortz and as to his claims in Counts One and Two for violation of the Fourth Amendment and the due process clause of the Fourteenth Amendment and his claim in Count Four for violation of Conn. Gen. Stat. § 31-51m.  He opposes the motions as to his claims against the City of New Haven and defendants Wearing and Kearney and as to all four counts in all other respects.  (Id. ¶¶

9-10.)  On February 27, 1998, Martinez gave a taped statement and examined an array of photos.  (Id.)

In early March 1998, Captain Brian Sullivan ordered Coppola and Rodriguez to stop their investigation.  For reasons that remain disputed, the investigation stopped completely.  At the heart of the dispute remains the question of who ordered the investigation stopped:  Captain Sullivan stated that "the Chief" ordered the stop; Chief Melvin Wearing denied giving the order.

Some time in early 2000, a series of newspaper articles appeared which drew public attention to the fact that the Cusick murder investigation had been halted after a promising lead had been developed.  (See Kearney Defs. Mot. Summ. Jud., IA Final Report at page 3.)  Around that time, State's Attorney Michael Dearington informed Chief Wearing that the State's Attorney's office had begun an investigation of the department's handling of the Cusick case.  (Ex. H, Wearing tr. at 91, 95.)  Wearing knew the State's Attorney's probe had begun because police officers from his department went to speak to the State's Attorney's office with their concerns.  (Id. at 95.)

Chief Wearing then initiated a police Internal Affairs ("IA") investigation into the department's failure to investigate the Cusick murder.  (City Defs. 56(a)(1) statement ¶ 22.)  Defendant Bryan Kearney headed this investigation and wrote the final report and findings of fact.  (See Kearney Defs. Mot. Summ. Jud., IA Final Report.)   At the same time as the IA investigation, the State's Attorney's office convened a grand jury to investigate the same matter.  (Id. at 65-66.)  The grand jury found probable cause to believe Captain Sullivan had committed the crimes of

Hindering Prosecution in the First Degree and Tampering with Evidence.  Id.
Captain Sullivan was subsequently tried on these charges and acquitted.

In January 2001, Wearing officially reprimanded Coppola and Rodriguez for
(1) failing to file evidence properly; (2) withholding evidence; and (3) failing to report
the stop order to a superior officer.

**B.    The Stop Investigation Meeting.**

Investigating the Cusick murder, Coppola and Rodriguez obtained a witness
statement which was completed and typed on March 4, 1998.  (Ex. A, Kendall tr. at
37, 43-44.)[2]  A few days later, they met with Captain Sullivan to brief him on the
statement.  (Id. at 45.)  Present at the meeting were Sullivan, Sergeant Rodgers,
Detectives Rodriguez and Coppola, and Sergeant Kendall.  (Id.)

Rodriguez and Coppola sat down at the table and started to explain that they
had information to get a search warrant.  (Id. at 45-46.)  After Coppola described
their evidence, Sullivan said, "You will cease this investigation per the chief, and give
us all the documents and everything you have on the case."  (Ex. B, Rodriguez
depo. at 25.)[3]  At the time, Melvin Wearing was Police Chief.  (City Defs. 56(a)(1)
statement ¶ 1.)  Thus to Rodriguez  "the chief" meant Wearing.  (Ex. B, Rodriguez

---

[2]  Edward Kendall testified at the Sullivan trial, State v. Brian Sullivan, CV-00-0496678, on
Sept. 30, 2003.

[3]  Sergeant Kendall's trial testimony regarding this encounter varies somewhat from that of
Rodriguez and Coppola.  (See Ex. A, Kendall tr. at 45-47.)  Kendall stated that after
listening to Coppola, Sullivan walked out of the meeting, heading in the direction of the
Chief's office.  He was gone for about five minutes, and it was not until he came back that
he gave the stop order.  At that time, he was visibly upset.  Kendall confirms that Sullivan
said the investigation was to be stopped per order of the Chief.  (Id.)

depo. at 25.)[4]  This evidence raises a factual question as to whether Chief Wearing gave the stop order.

Captain Sullivan's statement to the IA investigators only confirms the factual dispute:  Sullivan stated that Wearing ordered him to stop the investigation, to give the statement to North Haven, and to let them continue to investigate.  (Ex. D, Sullivan 5-12-00 statement at 33.) [5]    Sullivan explained to the Chief that there was a possibility the Cusick killing occurred in New Haven, in which case New Haven should have continued its investigation.  (See id. at 34-35, 37-38.)  Wearing nonetheless ordered the New Haven investigation stopped.  (Id. at 35.)  Sullivan had never before received an order to stop an investigation or to stop assisting another department.  (Id. at 36.)

### C.    Protected Speech with State's Attorney's Office.

Within a few days after the stop order, Rodriguez and Coppola went to see Dennis Kelly, an inspector at the State's Attorney's office.  (Ex. E, Coppola depo. at 110-12.)  Coppola told Kelly how the investigation had progressed and how Sullivan had cut them off.  (Id. at  112.)  Kelly told Coppola and Rodriguez, "Secure what you have in your desk, and just do what you are told.  I'll take it from here."  (Id.)  Following Kelly's instructions, Coppola secured the photo array and a copy of the statement.  (Id. at 112-14.)  Coppola delivered this evidence to the State's Attorney's

---

[4]  In addition, Chief Wearing testified that he was aware that his subordinates during his tenure sometimes relayed orders by saying, "this is what the chief wants".  (Ex. C, Wearing depo. at 36.)  He was not aware of anyone ever using that authority improperly.  (Id.)
[5]  These are Sullivan's statements in the IA investigation.  Sullivan asserted his Fifth Amendment privilege against self-incrimination at his trial.

office, at the request of an inspector there, before the police IA investigation began. (Id. at 97-98, 122-24.)

Following an IA investigation which is discussed at greater length below, Chief Wearing reprimanded plaintiffs for (1) failing to hand the photo board and statement in to the Property Room; (2) withholding this evidence; and (3) failing to report immediately to a superior officer in the department their concerns regarding Sullivan's order.

### D. There is a Genuine Issue of Material Fact as to Whether Chief Wearing Used the Reprimand to Retaliate Against Plaintiffs for Reporting Their Concerns.

There is substantial evidence that Wearing's motive in initiating the IA investigation, manipulating the investigation, and in ultimately reprimanding plaintiffs was to punish them for speaking to the State's Attorney's office.

### 1. There Is Strong Evidence Wearing Wanted to Punish Plaintiffs for Their Speech.

First, as described above, there is a genuine issue of material fact as to whether Wearing himself gave the stop order and was trying to shift blame onto others. Second, there is competing evidence that Wearing was angry at plaintiffs for interfering in Sullivan's career. Coppola testifies that when Captain Sullivan was released at one point, Wearing stopped Coppola in the basement and said, "Are you happy now?" (Ex. E, Coppola depo. at 100.)

Third, and probably most compelling, there is evidence that Wearing regarded plaintiffs' decision to go outside the department -- however necessary and correct it was -- as a personal affront, and intended to make them pay for it. Under cross-

examination at the Sullivan trial, Wearing admitted he would have preferred

Rodriguez and Coppola to stay "inside" the department.  He testified:

> Q. If they got a problem, bring it inside and we'll deal with it?
> A. That's correct.
>     . . . .
> Q. Instead of coming to you, they came across the street and went to Michael Dearington?
> A. That's correct.
> Q. Michael Dearington, let me -- let me see if I understand your chain of command relationship.  He's not your boss; is he?
> A. No. He's not my boss. But --
> Q. He is this -- I don't mean to interrupt you.  But he's the head law enforcement guy in the this area?
> A. That's correct.
>     . . . .
> Q. And, sir, one of the problems with these police officers who came over here to him instead of going to you is that you wanted to know what was going on, correct?
> A. That's correct.
> Q. And they had -- you found out they interviewed a number of police officers and you didn't know about it, correct?
> A. That's correct.
> Q. And you weren't there?
> A. That's correct.
> Q. And you wanted to be there?
> A. That's correct.
> Q. And they didn't invite you?
> A. That, they didn't.
> Q. And you find out Dearington's got this investigation going on about your department and no one told you, right?
> A. That's correct.
> Q. And you men are being summoned over here to give statements to [Inspector] Reardon without your knowledge?
> A. If that's the case, that's correct.
> Q. Well, that's what happened.  That's what you found out?
> A. Yeah.
> Q. And that upset you, didn't it?
> A. Well. I didn't like it.

(Ex. H, Wearing tr. at 95-98.)

Wearing's desire to retaliate against the officers who aired the department's

dirty laundry is apparent from his inappropriate involvement in the IA investigation.

From the outset, Chief Wearing did not give his own IA team full information regarding the case.  (Ex. F, Minardi depo. at 27.)  He did not tell them that Kendall and Sullivan and Attorney Jack Kelly had begun an investigation themselves.  (Id.)  He did not tell them that Kendall, Sullivan and Kelly had already taken a statement from a property clerk, nor did he give them that statement.  (Id. at 27.)

Wearing demanded to be kept updated and ordered no key interviews be taken without his knowledge.  (Ex. F, Minardi depo. at 25-26.)[6]  He also appears to have picked as IA staff officers he felt he could manipulate and removed officers he felt he could not.  Minardi testified that Wearing deliberately scheduled a key interview when Minardi was absent, and ultimately removed Minardi from the team after repeated clashes with him.  (Ex. F, Minardi depo. at 27, 29, 63, 90.)  Wearing referred to one of Minardi's memoranda to the IA file as "a lie".  (Ex. C, Wearing depo. at 37-38.)  Wearing nonetheless vehemently denies that he interfered in the investigation:  "I would never hinder or stop an investigation.  But I certainly would want to be apprised of what is going on with a member of the department.  So the IA supervisor would automatically come to me and advise me of what's going on.  And I always say, let's see where it takes us."  (Id. at 29.)[7]

---

[6]  Wearing determined the order of the interviews:  "He was very specific about this group of people, then this group.  Also, 'You can't go outside the department without my permission.'. . ."  (Ex. F, Minardi depo. at 46.)  This statement reflects Wearing's mindset not only as to IA's investigation, but likely as to plaintiffs' conduct.

[7]  Minardi testifies that Wearing interfered in a previous IA investigation into the conduct of a police captain.  (Ex. F., Minardi depo at 85-86.)  Wearing again denies that he would ever do such a thing: "Q.  So if I understand you correctly, you're saying during your tenure as chief, you're saying you never decided any investigation should not go forward?  A.  That's correct."  (Ex. C, Wearing depo. at 29.)

Moreover, Wearing was from the outset a "party of interest" in the IA investigation, because Rodriguez and Coppola said Sullivan told them the Cusick case was being stopped "per order of the chief".  (Ex. F, Minardi depo. at 38.)  Although he was himself implicated, Wearing manipulated the investigation by ordering who should be interviewed first.  (Id. at 46.)[8]  The Chief interfered with the investigation in a number of ways, including threatening the IA team: "one of the other things he used to use as a favorite threat of his was, it never worked, but he used to call us in and say stuff like, "You know you are still going to have to work for me even after the politicians are gone."  (Id. at 27-28.)  Minardi felt that Wearing's improper influence impeded his ability to get answers in the investigation.  (Id. at 81.)

Wearing also initially refused to give a statement himself when asked.  (Id. at 46-47.)

There is also evidence that Wearing had decided what the results of the investigation should be before it was done.  Captain Kearney told Minardi that "they had compiled a list . . . showing who did what wrong, and he said that the chief's list was the longest one."  (Ex. F, Minardi depo. at 37.)  Every day Minardi or Kearney reported their progress to Chief Wearing.  (Ex. E, Coppola depo. at 99.)  Sullivan was in Wearing's office every night when Coppola came in.  (Id. at 100.)  At this time, Sullivan was not talking to Coppola; Wearing did not say hello to Coppola or Rodriguez.  (Id.)

---

[8]  The IA investigators took the statements of Rodriguez, Coppola and Rogers "back to back" but did not do so with Sullivan and Kendall.  (Ex. E, Coppola depo. at 83.)

During the IA investigation, indeed within weeks of Coppola's giving his statement, Kearney said to Coppola, "If you didn't go outside the department, you wouldn't be in trouble."  (Id. at 101; see also Ex. F, Minardi depo. at 30-32.)

The stories of Keith Wortz and John Minardi also demonstrate Wearing's inclination to punish anyone who went "outside" the department.  In 1997, Detective Keith Wortz was providing the North Haven Police Department with information regarding the Cusick murder.  (Ex. G, Wortz depo. at 34.)   Then in March 1997, Captain Sullivan ordered Wortz not to do anything else to assist North Haven.  (Id.)  Wortz was troubled by this order and eventually went to the State's Attorney's office with his concern.  (Id. at 34-35.)  Wearing retaliated in a number of ways, including passing Wortz over for promotion, reprimanding him where others were not being reprimanded, and refusing seriously to entertain his complaints.  (Id. at 36-38.)  Chief Wearing indicated he was upset that Wortz took the matter outside the department, saying something to the effect of, "You are not a whistleblower, you are a piece of shit."  (Id. at 38.)[9]

Similarly, Minardi described a pattern of being passed over for promotions and sought after assignments, being placed in undesirable assignments, and having Wearing ask others if they could "get [Minardi] on anything."  (Ex. F, Minardi depo. at 31-32.)

---

[9]  In a bizarre turn of events, there was a recommendation that Wortz be commended for going to the State's Attorney's Office.  Wortz was never formally reprimanded for failing to follow the chain of command, as Rodriguez and Coppola were.  (Pl. Coppola Mem. in Opp. Ex. G.)

### 2. Whether Plaintiffs Would Have Been Reprimanded Absent Their Speech.

That plaintiffs went to the State's Attorney's office with their concerns was laudable, not reprehensible.  Moreover, going to the State's Attorney was the only sensible thing they could do.   In holding the photoboard and copy of the statement they both acted in keeping with the State's Attorney's office's instructions and in keeping with established practice within the department.  Other officers who acted similarly were not disciplined.  This evidence again raises a genuine issue of material fact as to whether the disciplining of Coppola and Rodriguez was a punishment for their speech.

### a. Wearing Admits That a Police Officer Who Felt the Chain of Command Was Not Responding Could Go to the State's Attorneys' Office.

Chief Wearing admits that a police officer who felt the chain of command was not responding could go to the Board of Police Commissioners, the Mayor's Office, and the State's Attorney.  (Ex. C, Wearing depo. at 32-33.)  (This statement is supported by a rough consensus among the officers that going to the State's Attorney was the right thing to do under the circumstances.  (E.g., Ex. F, Minardi depo. at 102-03; Ex. G, Wortz depo. at 67.)

Coppola and Rodriguez had every reason to believe the chain of command would not respond.  Coppola did not speak to Wearing regarding Sullivan's stop order because "Sullivan said he gave the order".  (Ex. E, Coppola depo. at 118.)  He did not go to Assistant Chief Douglas MacDonald because Wearing, Sullivan and MacDonald "were best friends.  They golfed together, they drank together, they ate lunch together, they smoked cigars together. . . .  It was no one I could have gone to in that place."  (Id. at 119.)  Rodriguez states, "The chief gave the direct order to give

to Sullivan to give to us.  So why should I go to him?"  (Ex. B, Rodriguez depo. at 31; 75.)[10]

Moreover, other officers who acted similarly were not disciplined.  John Minardi testifies that he went outside the chain of command regarding the investigation of a police captain in the late nineties, and that although Wearing knew it, he was not disciplined for it.  (Ex. F, Minardi depo. at 29-32.)  Wearing also admitted that Wortz went outside the chain of command in reporting Captain Sullivan's stop order to him on the Cusick case to the State's Attorney's office.  (Ex. C, Wearing depo. at 14.)  Nonetheless, Wortz was not disciplined for this action -- indeed he was commended.  (Pl. Coppola Mem. in Opp. Ex. G.)[11]

Finally, Dennis Kelly, the inspector at the State's Attorney's office had told Coppola and Rodriguez, "Secure what you have in your desk, and just do what you are told.  I'll take it from here."  (Ex. E, Coppola depo. at 112.)  Captain Kearney was aware of this instruction, as was Chief Wearing when he issued the reprimands.[12]

---

[10] Before the IA investigation began, the State's Attorney's office contacted Coppola and Rodriguez and asked them to explain why the Cusick murder investigation had stalled.  (Ex. E, Coppola depo. at 122-24.)  Inspector Reardon of the State's Attorney's office at that time took statements from Coppola and Rodriguez and took the photo board.  (Id. at 97-98, 122-24.)  Later, when the IA investigation had begun, State's Attorney Michael Dearington advised them that he did not want anyone in the police department to know about the statements for fear of some type of retaliation.  (Id. at 92.)

[11] This is probably due to Wortz's self-described "whistleblower" status in the press.

[12] This instruction was confirmed to the IA investigators on November 30, 2000, when State's Attorney Michael Dearington wrote a letter to Thayer Baldwin, Corporation Counsel, indicating that plaintiffs had come to his inspector with their concerns.  Even more importantly, Attorney Dearington wrote that his inspector had advised the detectives to follow the direction of their supervisor and retain copies of their paperwork.  (Pl. Coppola Opp. Mem. Ex. F (Dearington letter); Kearney Def. Mem. attachment, Final IA report, at 65-66.)

### b.  Retaining Photo Boards and Statements to the End of an Investigation Was Common Practice.

Similarly, there is a genuine issue of material fact as to whether detectives regularly kept original investigatory materials in their desks without being reprimanded.

There is substantial evidence that detectives commonly kept photo arrays and statements in their desks.  A photo array is not generally placed in evidence right away.  (Ex. B, Rodriguez depo. at 73; Ex. E, Coppola depo. at 115.)  It was common practice for detectives to keep photo arrays secured in their desks until an investigation was complete.  (Id. at 115-16; see also Ex. A, Kendall tr. at 113[13]; Ex. D, Sullivan statement at 68-69 (originals should go in the record room but sometimes they find them in detectives' desk drawers, if that happened, they would just tell the detective to put it in the record room where it belonged).)

Rodriguez and Coppola saw a box removed from Wearing's office which contained original cassettes, statements, and photo boards on two unsolved murders which had occurred nine years previously.  (Ex. B, Rodriguez depo. at 73; Ex. E, Coppola depo. at 116-17.)  Coppola still frequently sees photo boards kept in other officers' desks.  (Id. at 118.)

In sum, there is a genuine issue of material fact as to whether reprimanding Coppola and Rodriguez for withholding evidence was pretextual, because other officers were not disciplined for similar conduct.

---

[13] Kendall held the Cusick tape and statement in his possession for two years.  (Ex. A, Kendall tr. at 61.)  He stated that holding evidence in one's desk, even though it violates police department rules, is "a normal practice, every single day practice in the New Haven Police Department Detective Division to hold onto statements, to hold on to tapes, to hold on to reports."  (Id. at 62.)  He did not believe he was violating any rules by holding the tape and statement himself.  (Id.)

### E.   Whether Chief Wearing Was the City Official Ultimately Responsible for Disciplining Police Officers.

Chief Wearing stated, "I am the chief and I give the direction in the department." (Ex. C, Wearing depo. at 9.) He was responsible for the overall operation of the department, including disciplinary actions and overall supervision. (Id. at 5.) He had the sole authority to begin an IA investigation. (Id. at 12.) Wearing stated, "There's no investigation that's lodged in the department in terms of an internal affairs investigation without my authority. There's no independent investigation carried out without my acknowledgment." (Id. at 10.)

The Board of Police Commissioners is responsible for charges preferred to them by the Chief. (Id. at 9, 12.) These cases include violations of police department policy. (Id. at 13-14.)

In this case, however, charges were not preferred to the Board of Commissioners. Moreover, despite his conflict of interest, there is evidence that Wearing manipulated the investigation, and regarded information he deemed unhelpful as a lie. (See Ex. C, Wearing depo. at 37-38; Ex. F, Minardi depo. at 27-28, 38, 46.) And again, despite the conflict, Wearing himself issued the reprimands. (City Defs. Rule 56(a)(1) statement ¶ 24.)

## V.   Summary Judgment Standard

The principles governing consideration of summary judgment motions are well established. Summary judgment should be granted only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett; 477 U.S. 317, 322 (1986). The court must view the evidence in the light most favorable to the party against whom summary judgment

is sought and must draw all reasonable inferences in his favor.  See, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 298 (2d Cir. 1996).  In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving party.  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).  Issues of credibility cannot be resolved in the context of a motion for summary judgment.  United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).

**VI.     Argument as to Count One.**

**A.     The First Count of the Rodriguez Complaint Claims Retaliation against Detective Rodriguez for Exercising His First Amendment Rights.**

Defendants moved for summary judgment as to plaintiff Coppola's First Amendment claims, but not as to those of plaintiff Rodriguez.  The First Count of the Rodriguez Complaint specifically alleges violations of the Fourth and Fourteenth amendments. Although it is not titled as claiming a First Amendment violation, the facts alleged obviously give notice that the central claim is one for violation of the First Amendment.  See Compl. ¶ 25 ("Plaintiff's reprimand was retaliatory, vindictive, and in direct response for plaintiff's role in investigating the Cusick homicide and for informing the New Haven State's Attorney's Office of the order to cease the investigation."); Fed. R. Civ. P. 8(f); Mareno v. Rowe, 910 F.2d 1043, 1045 (2d Cir. 1990) (affirming denial of default where answer was obviously intended to notify plaintiff that another entity was proper defendant), cert. denied, 498 U.S. 1028 (1991); see also Kimes v. Stone, 84 F.3d 1121, 1129 (9th Cir. 1996) (substantial

justice in civil rights case means complaint sufficient if fair notice given of claim and ground upon which it rests).

Plaintiff responds to defendants' motion as if they had sought summary judgment as against his First Amendment claim as well as his other claims.

### B. Summary Judgment Should Be Denied as to Plaintiff's Claim for Retaliation, Because There is a Genuine Issue of Material Fact as to Whether Plaintiff Was Reprimanded Because of His Protected Speech.

The parties agree that "a public employee who seeks to recover on the ground that he has been disciplined because of the exercise of First Amendment rights must establish, as an initial matter, that his speech may be 'fairly characterized as constituting speech on a matter of public concern,' and that that speech was "at least a 'substantial' or 'motivating' factor" in the adverse action taken by the employer." Heil v. Santoro, 147 F.3d 103, 109-10 (2d Cir. 1998) (citations omitted).

### 1. The Parties Agree the Speech Was Protected.

Defendants concede that plaintiffs' speech with the State's Attorney's Office was protected. (City Defs. br. at 17; Kearney Defs. br. at 7-8.) Thus, the first element of the Heil test is met.

### 2. There is a Genuine Issue as to Whether the Protected Speech Was a Substantial or Motivating Factor in Defendants' Retaliation Against Plaintiffs.

Defendants assert, however, that it is undisputed that this speech was not a substantial or motivating factor in the adverse actions taken against plaintiffs. On the contrary, there is significant evidence that Chief Wearing acted to punish plaintiffs because of their speech at the State's Attorney's Office.

First, as described above, there is a genuine issue of material fact as to whether Wearing himself gave the stop order and then acted to protect himself. Second, there is competing evidence that Wearing was angry at plaintiffs for damaging Sullivan's career.  (See Ex. E, Coppola depo. at 100.)

Third, and probably most compelling, there is evidence that Wearing regarded plaintiffs' decision to go outside the department -- however necessary and correct it was -- as a personal affront, and intended to make them pay for it.  This is apparent partly from Wearing's inappropriate attempts to direct the outcome of the IA investigation, including: not giving IA team full information regarding the case, receiving daily progress reports, and manipulating the investigation by ordering who should be interviewed first, and threatening the IA team.  (Ex. E, Coppola depo. at 99; Ex. F, Minardi depo. at 27-28, 38, 46.)  Wearing's total disregard for the process is apparent:  "one of the other things he used to use as a favorite threat of his was, it never worked, but he used to call us in and say stuff like, "You know you are still going to have to work for me even after the politicians are gone."  (Id. at 27-28.)

There is also evidence that Wearing had decided what the results of the investigation should be before it was done -- and that Captain Kearney knew this and nonetheless persisted with the sham investigation.  Kearney told Minardi that "they had compiled a list . . . showing who did what wrong, and he said that the chief's list was the longest one."  (Ex. F, Minardi depo. at 37.)  Coppola and Rodriguez were apparently already on the list during the IA investigation.  Indeed within weeks of Coppola's giving his statement, Kearney said to Coppola, "If you didn't go outside the department, you wouldn't be in trouble."  (Ex. E, Coppola depo. at 101.)  This is crucial evidence, in that it demonstrates Kearney knew, while he

was supposedly investigating, that part of goal of the investigation was to put Coppola and Rodriguez "in trouble".  Moreover, <u>he</u> <u>knew</u> they were in trouble <u>because</u> <u>of</u> <u>their</u> <u>protected</u> <u>speech</u>, not because they held on to the photo array or failed to follow the chain of command.

The stories of Keith Wortz and John Minardi also demonstrates Wearing's willingness  to punish anyone who went "outside" the department.  Wortz went "outside" the department with concerns regarding the Cusick case.  (Ex. G, Wortz depo. at 34-35.)  Wearing retaliated in a number of ways and <u>told</u> Wortz he was angry because Wortz had gone outside the department.   (<u>Id.</u> at 34-38.)  (He used words to the effect of "You are not a whistleblower, you are a piece of shit."  (<u>Id.</u> at 38.).)  Minardi also describes a pattern of harassment after having "gone outside the department" on an ethics issue.  (Ex. F, Minardi depo. at 31-32.)

In sum, the evidence raises a genuine issue of material fact as to whether Chief Wearing initiated the IA investigation, manipulated it, and ultimately reprimanded plaintiffs in retaliation for their speech to the State's Attorney's office.

> **3.     Defendants Have Not Met Their Burden to Establish That They Reasonably Believed the Protected Speech Would Disrupt the Government's Activities.**

Defendants next argue that even if plaintiff meets his initial burden, they should nonetheless escape liability because the speech was disruptive.

If the employee meets the initial test set forth above, the government employer may nonetheless prevail "if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, <u>Waters v. Churchill</u>, 511 U.S. 661, 673, 677, 114 S.Ct. 1878 (1994) (plurality opinion), and can persuade the court that

the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech, see, e.g., id. at 668, 673, 681, 114 S.Ct. 1878; Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.), cert. denied, 516 U.S. 862, 116 S.Ct. 173 (1995).  Substantial weight is accorded the government employer's prediction that given speech has the potential for disruptiveness, but its prediction must be reasonable. Thus, an employer that has received a report of such speech must make a reasonable investigation before deciding to take action against the employee. See Waters v. Churchill, 511 U.S. at 677-78, 114 S.Ct. 1878 (employer should proceed with "a certain amount of care," to wit, "the care that a reasonable manager would use before making an employment decision--discharge, suspension, reprimand, or whatever else--of the sort involved in the particular case")". Heil, 147 F.3d at 109-110.

Not surprisingly, defendants offer no evidence that plaintiffs' speech itself was disruptive.[14]  Indeed, it is hard to imagine how the action of careful police officers concerned at receiving an unusual order who report that order to the State's Attorney's Office could be disruptive of a properly functioning department.  Chief Wearing admitted that a police officer who felt the chain of command was not responding could go to the

---

[14] The City defendants state, "Coppola and Rodriguez' conduct was contrary to the regular operation of the paramilitary NHPDS.  Without question, that type of conduct impairs working relationships and disrupts the operation of the NHPDS.  The defendant Wearing is entitled to deference in disciplining the plaintiffs for what he observed as violations of NHPDS policy."  (City Defs. br. at 20.)  First, Wearing testified that under certain circumstances, it is proper for an officer to go to the State's Attorney -- and there is a genuine issue as to the situation here fit those circumstances.  (See Ex. C, Wearing depo. at 32-33; Ex. E, Coppola depo. at 118-19; Ex. B, Rodriguez depo. at 31, 75.)  Second, the legal question here is whether the speech itself was disruptive. Heil, 147 F.3d at 109-110.  There is no evidence that it was.  Third, defendants seem confused about their own contentions.  They contend, supposedly, that plaintiffs were not disciplined for their speech but rather for their conduct in withholding evidence and failing to report within the department.

Board of Police Commissioners, the Mayor's Office, and the State's Attorney.  (Ex. C, Wearing depo. at 32-33.)  Several officers agreed that going to the State's Attorney was the right thing to do under the circumstances.  (<u>E.g.</u>, Ex. F, Minardi depo. at 102-03; Ex. G, Wortz depo. at 67.)  Wearing also stated, "To his credit, Detective Rodriguez had the integrity to voice his concerns to the an investigator at the State's Attorneys Office.  (City Def. br. Ex. F (reprimand letter).)

> **4.     Defendants Have Not Met Their Burden to Establish They Would Have Taken the Same Adverse Action in the Absence of the Protected Speech.**

Defendants also claim that they may escape liability because they would have taken the same disciplinary action regardless of the protected speech.

Even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech.  <u>See, e.g.</u>, <u>Mt. Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. at 287, 97 S. Ct.  568; <u>White Plains Towing Corp. v. Patterson</u>, 991 F.2d 1049, 1059 (2d Cir. 1993); <u>see also</u> <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 535 (2d Cir.1994); <u>Sher v. Coughlin</u>, 739 F.2d 77, 82 (2d Cir.1984). This principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct.  <u>See, e.g.</u>, <u>Waters</u>, 511 U.S. at 681, 114 S.Ct. 1878 ("An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements."); <u>Mt. Healthy</u>, 429 U.S. at 286, 97 S.Ct. 568; <u>Heil</u>, 147 F.3d at 110.

      **a.**      **There is a Genuine Issue of Material Fact as to Whether Defendants Would Have Taken the Same Discipline Against Plaintiffs in the Absence of their Speech.**

Wearing disciplined plaintiffs for violating Rule 15, section 36 of the Department rules, which provides in pertinent part, "Employees of the Department shall report immediately to his superior officer any information he has concerning the violation of any law or ordinance or any matter that should come to the attention of the department." (City Def. br. Ex. F.) Wearing indicated in the reprimand letter as follows, "[Rodriguez] did not notify anyone in the Department regarding the possible illegality of the termination of the investigation. He never inquired which chief had allegedly ordered the investigation halted (so as to consider bringing the matter to the attention of the other chief), nor did he approach the Department's office of Internal Values and Ethics." (Id.)

There is real question as to whether plaintiffs acted correctly in reporting their concerns to the State's Attorney, and not to Chief Wearing. As described previously, Chief Wearing admitted that a police officer who felt the chain of command was not responding could go to the Board of Police Commissioners, the Mayor's Office, and the State's Attorney. (Ex, C, Wearing depo. at 32-33.) Police officers agreed this was the right thing to do. (E.g., Ex. F, Minardi depo. at 102-03; Ex. G, Wortz depo. at 67.) Coppola and Rodriguez had every reason to believe their orders came from Chief Wearing, leaving them no superior officer to inform. (Ex. B, Rodriguez at 31, 75; Ex. E, Coppola depo. at 118.) Moreover, Wearing, Sullivan and Assistant Chief MacDonald "were best friends. They golfed together, they drank together, they ate lunch together, they smoked cigars together. . . . It was no one I could have gone to in that place." (Id. at 119.)

In addition, other officers who acted similarly were not disciplined. John Minardi testifies that he went outside the chain of command regarding the

investigation of a police captain in the late nineties, and that although Wearing knew it, he was not disciplined for it.  (Ex. F, Minardi depo. at 29-32.)  Wearing also admitted that Wortz went outside the chain of command in reporting Captain Sullivan's stop order to him on the Cusick case to the State's Attorney's office.  (Ex. C, Wearing depo. at 14.)  Nonetheless, Wortz was not disciplined for this action -- indeed he was commended.  (See Pl. Coppola Mem. in Opp. Ex. G.)

Finally, Dennis Kelly, the inspector at the State's Attorney's office had told Coppola and Rodriguez, "Secure what you have in your desk, and just do what you are told.  I'll take it from here."  (Ex. E, Coppola depo. at 112.)   Captain Kearney was aware of this instruction, as was Chief Wearing when he issued the reprimands. (See Ex. F to Mem. in Opp. of Plaintiff Coppola (Dearington letter).)  Rodriguez and Coppola were simply following his instructions.

Plaintiffs submit that this evidence, combined with the evidence of Wearing's retaliatory motive, raises a genuine issue of fact as to whether defendants would have disciplined plaintiffs absent their speech.

> **b.  There is a Genuine Issue of Material Fact as to Whether Retaining Photo Boards and Statements to the End of an Investigation Was Common Practice for Which Officers Were Not Reprimanded.**

There is a genuine issue of material fact as to whether detectives regularly kept original investigatory materials in their desks without being reprimanded.  (Ex. A, Kendall tr. at 113; Ex. B, Rodriguez at 73; Ex. D, Sullivan statement at 68-69; Ex. E, Coppola depo. at 115.)

As Detective Coppola explained, a photo array is not generally placed in evidence right away.  (Ex. E, Coppola depo. at 115; see also Ex. B, Rodriguez depo.

at 73.)  It was common practice for detectives to keep photo arrays secured in their desks until an investigation was complete.  (Ex. E, Coppola depo. at 115-16.) Indeed a box was removed from Chief Wearing's office which contained original cassettes, statements, and photo boards on two unsolved murders which had occurred nine years previously.  (Id. at 116-17; see also Ex. B, Rodriguez depo. at 73.)  Photo boards are still kept in other officers' desks.  (Ex. E, Coppola depo. at 118.)

Again, this evidence raises a dispute as to whether the defendants would have disciplined plaintiffs absent their speech.

### c.    Conclusion as to Retaliation Claim

For these reasons, summary judgment should be denied as to plaintiff's claim for retaliation in violation of the First Amendment.

### C.    Similarly, Summary Judgment Must Be Denied as to Plaintiff's Equal Protection Claims under the Fourteenth Amendment, Because There is a Genuine Issue of Material Fact as to Whether Rodriguez Was Punished for Exercise of His First Amendment Rights.

Count One also asserts a claim for violation of the right to equal protection guaranteed by the Fourteenth Amendment.[15]  A violation of equal protection by selective enforcement arises if (1) the person, compared with others similarly situated, was selectively treated; and (2) ... such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.  LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (quoting LeClair v.

---

[15] Plaintiff accedes to the granting of summary judgment as to his claims in counts one and two for violation of due process as guaranteed by the Fourteenth Amendment.

<u>Saunders</u>, 627 F.2d 606, 609-10 (2d Cir.1980), <u>cert. denied</u>, 450 U.S. 959, 101 S.Ct. 1418 (1981)); <u>Crowley v. Courville</u>  76 F.3d 47, 52 -53 (2d Cir. 1996).

Thus, in <u>Capasso v. Metropolitan Transp. Authority of State of N.Y.</u>, 198 F.Supp.2d 452, 462 (S.D.N.Y. 2002), the District Court denied summary judgment on an equal protection claim where the plaintiff raised genuine issues as to whether she had been treated differently from other officers, and where that treatment was in retaliation for a claim of sexual harassment she had made against a superior officer.

Plaintiff respectfully submits that for the same reasons he has established that defendants violated the First Amendment by retaliating against him for protected speech, he has established this claim.

>    **D.    Defendants Are Not Entitled to Qualified Immunity as to Count One Because There Is a Genuine Issue of Material Fact as to Whether the Reprimands Were Issued with Intent to Punish Plaintiffs for Their Protected Speech.**

To state a claim under §1983, a plaintiff must show "(1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  <u>Dwares v. City of New York</u>, 985 F.2d 94, 98 (2d Cir. 1993). The doctrine of qualified immunity shields public officials from liability under two circumstances:  (1) where the official's conduct does not violate clearly established statutory or constitutional rights about which a reasonable person would have known; or (2) where it was objectively reasonable for the official to believe that his actions did not violate those rights.  <u>Loria v. Gorman</u>, 306 F.3d 1271, 1281-82  (2d Cir. 2002); <u>Whalen v. County of Fulton</u>, 126 F.3d 400, 404 (2d Cir. 1997).  "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted.'" Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002) (quoting Saucier v. Katz, 533 U.S. 194, 200 (2001)).

Defendants assert they are entitled to qualified immunity as to plaintiffs' claims for retaliation.  In Aquavia v. Grogins, 208 F. Supp. 2d 225 (D. Conn. 2003), Judge Arterton addressed a very similar argument.  There, a town employee argued that she had been reprimanded for improperly using town supplies for her personal business in retaliation for her exercise of her First Amendment rights regarding another town issue.  The town official who disciplined her claimed qualified immunity.  The court denied summary judgment, reasoning as follows:

> Here, however, the First Amendment violation complained of focuses on [the employer's] state of mind in that he is alleged to have issued the disciplinary warning with the intent to punish [the plaintiff] for speech on a matter of public concern. . . .  Thus, the question is not whether a reasonable employer could have concluded the propriety of disciplining Aquavia for using office equipment; instead, it is whether a reasonable employer could have determined that disciplining an employee in retaliation for protected speech was unlawful. Locurto v. Safir, 264 F.3d 154, 168 (2d Cir.2001) ("[W]here a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law.") (citing Crawford-El v. Britton, 523 U.S. 574, 589, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir.1996) ("[T]he employer's actual (subjective) motive is not irrelevant in a qualified immunity inquiry" on a First Amendment retaliation claim.)).

Aquavia, 208 F.Supp.2d at 235-37.  Based on this reasoning, the court denied summary judgment where the plaintiff-employee had no history of being disciplined and the action for which she was disciplined was a common practice.  See also Birmingham v. Ogden, 70 F. Supp. 2d 353, 374 (S.D.N.Y.,1999) (denying summary judgment where police chief fired police officer and claimed firing was objectively reasonable, because taking facts in favor of plaintiff, jury could find firing unreasonable).

Plaintiff refers the Court to the evidence of Chief Wearing's retaliatory motive already outlined above.  With regard to Defendant Kearney, the Court must consider Kearney's statement to Coppola during the IA investigation, "If you didn't go outside the department, you wouldn't be in trouble."  (Ex. E, Coppola depo. at 101; <u>see</u> <u>also</u> Ex. F, Minardi depo. at 30-32.)   Kearney also told Minardi that "they had compiled a list . . . showing who did what wrong, and he said that the chief's list was the longest one." (<u>Id.</u> at 37.)  These comments raise a genuine issue of fact as to whether Kearney knowingly conducted a sham investigation of Coppola and Rodriguez. Moreover, the first comment indicates that Kearney <u>knew</u> the purpose of the investigation -- and any disciplinary outcome -- would be in retaliation for "go[ing] outside the department, i.e. for speech that is conceded protected.

## VII.    <u>Summary Judgment Should Be Denied as to Count Two against the City</u>.

Count Two is brought directly against the City of New Haven, under <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 690 n. 55 (1978).  A single decision by "municipal policy makers" can be sufficient to impose liability on a municipality. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480, 106 S.Ct. 1292 (1986). Further, "an 'official policy' within the meaning of <u>Monell</u>  [can] be inferred from informal acts or omissions of supervisory municipal officials." <u>Turpin v. Mailet</u>,  619 F.2d 196, 200 (2d Cir.1980).  Thus, where an official is the ultimate decision maker regarding policies at issue in the case, the municipality is rendered liable for his acts under <u>Monell</u>.  <u>See</u> <u>Russo v. City of Hartford</u>, 158 F. Supp. 2d 214, 223 (D. Conn. 2001) (denying motion to dismiss <u>Monell</u> claim where plaintiff pled that police chief was ultimate decision maker regarding policies at issue in the case).

Here, there are genuine issues of material fact as to whether Chief Wearing was the ultimate decision maker regarding (1) initiating the IA investigation; and (2) disciplining the plaintiffs.  The Chief alone had the authority to begin an IA investigation.  (Ex. C, Wearing depo. at 12.)  He was also responsible for disciplinary actions.  (Id. at 5.)  Wearing viewed his authority expansively -- he stated, "I am the chief and I give the direction in the department."  (Id. at 9.)  He continued, "There's no investigation that's lodged in the department in terms of an internal affairs investigation without my authority.  There's no independent investigation carried out without my acknowledgment."  (Id. at 10.)

Typically, Board of Police Commissioners is responsible for charges preferred to them by the Chief.  (Ex. C, Wearing depo. at 9, 12.)  These cases include violations of police department policy.  (Id. at 13-14.)  In this case, however, charges were not preferred to the Board of Commissioners.  Wearing himself issued the reprimands.

Moreover, despite his conflict of interest, there is evidence that Wearing interfered with and manipulated the investigation. (Ex. F, Minardi depo. at 27-28, 37-38, 46; Ex. E, Coppola depo. at 99-100.)  There is also evidence that Wearing had predetermined that Coppola and Rodriguez were in trouble because they had gone outside his department.  Thus during the IA investigation, indeed within weeks of Coppola's giving his statement, Kearney said to Coppola, "If you didn't go outside the department, you wouldn't be in trouble."  (Id. at 101.)

Lastly, there is ample evidence that Wearing took no disciplinary action against other officers who violated the chain of command or kept evidence in their desks.  (Ex. A, Kendall depo. at 113; Ex. B, Rodriguez depo. at 73;  Ex. C, Wearing

depo. at 14; Ex. D, Sullivan statement at 68-69; Ex. E, Coppola depo. at 115-16; Ex.
F, Minardi depo. at 29-32.)

In short, Wearing's own testimony regarding his powers, his involvement in
the IA investigation, and his signature on the reprimands raise a genuine issue as to
whether he was in fact the ultimate decision maker in this case.  Given this genuine
issue, and the evidence previously set forth regarding Wearing's retaliatory motive,
summary judgment must be denied as to Count Two.

**VIII.    Summary Judgment Should Be Denied as to Count Three for Intentional
Infliction of Emotional Distress.**

The elements of intentional infliction of emotional distress are: (1) the actor intended
to inflict emotional distress, or knew or should have known that emotional distress was the
likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the
defendant was the cause of the plaintiff's distress; and (4) that the emotional distress
sustained by the plaintiff was severe."  Appleton v. Board of Educ., 254 Conn. 205, 210,
757 A.2d 1059 (2000).

"It is not enough that the defendant has acted with an intent which is tortious or even
criminal, or that he has intended to inflict emotional distress or even that his conduct has
been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to
punitive damages for another tort.  Liability has been found only where the conduct has
been so outrageous in character and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized
community."  Tartaglia v. Marino, 1994 WL 158890 (Conn. Super. Ct. Apr. 25, 1994)
(Moraghan, J.) (copy attached at Ex. I).

If the jury finds that Chief Wearing gave the stop investigation order and then used the IA investigation and the reprimand to attempt to shift blame from himself onto the very officers who attempted to do something right, then an award for intentional infliction of emotional distress would be appropriate. Accordingly, plaintiff respectfully submits that summary judgment should be denied as to this count.

**IX.    Summary Judgment Should Be Denied as to Count Four for Violation of Connecticut General Statutes Section 31-51q Claim.**

In Count Four, plaintiff brought claims for violations of Connecticut General Statutes sections 31-51m and 31-51q. Plaintiff accedes to the granting of summary judgment as to his claims under § 31-51m but opposes summary judgment as to his claims under section 31-51q. Connecticut General Statutes section 31-51q provides:

> § 31-51q. Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights
>
> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.

Defendants argue the 31-51q claim should fail because:  (1) plaintiff has not established that his exercise of his First Amendment rights did not substantially or materially interfere with their bona fide job performance or working relationship with their employer; and (2)

"discipline" as defined by the statute does not include written reprimands.  Defendants are incorrect.

     **A.**     **There is a Genuine Issue of Material Fact as to Whether the Plaintiffs' Speech Did Not Substantially or Materially Interfere with Their Bona Fide Job Performance or Working Relationship with Their Employer.**

Chief Wearing stated, "To his credit, Detective Rodriguez had the integrity to voice his concerns to the an investigator at the State's Attorneys Office.  (City Defs. br. Ex. F (reprimand letter).)  He also <u>admitted</u> that a police officer who felt the chain of command was not responding could go to the Board of Police Commissioners, the Mayor's Office, and the State's Attorney.  (Ex. C, Wearing depo. at 32-33; <u>see also</u> Ex. F, Minardi depo. at 102-03; Ex. G, Wortz depo. at 67.)  Thus, there is strong evidence that plaintiffs' speech was in fact part of doing a good job -- and was, by inference, not an interference with their job performance.

     **B.**     **"Discipline" for Purposes of Section 31-51q Includes Written Reprimands.**

Section 31-51q holds an employer liable for "discipline or discharge" of an employee for exercise of his or her First Amendment rights.  Defendants argue that "discipline" as used in section 31-51q does not include written reprimands.

First, the argument finds no support in the general definition of "discipline".  Webster's New College Dictionary defines "discipline" as:

        1 . . .: instruction
        2: a subject that is taught: a field of study
        3: training that corrects, molds or perfects the mental faculties or moral character
        4: punishment . . . .

Webster's New Collegiate Dictionary (G.C. Merriam Co. 1981 ed.)  A written reprimand clearly falls with the broad sweep of "discipline".  Had the legislature wished to limit the scope of § 31-51q to exclude retaliation in the form of reprimands, written or oral, it could have chosen a narrower word.  It did not do so.

Defendants argue that the meaning of "discipline" in section 31-51q should be narrowed because of the statute's similarity to section 31-51m.  The analogy to section 31-51m does not hold, because the two statutes have different language and provide different remedies.

Section 31-51m limits recovery in whistleblower cases to reinstatement of previous employment, payment of back wages and reestablishment of employee benefits.  Based on these limitations, the Superior Court in Urban v. Commissioner of Children and Families, 2001 WL 577133, at *10 (Conn. Super. Ct. 2001) (Parker, J.) (copy attached at Ex. I), concluded, that "disciplined" and "otherwise penalized" must be "restricted to meaning action(s) by the employer which results in [the loss of a position, a loss of wages, and/or a loss of employee benefits."[16]

Unlike section 31-51m, section 31-51q does not limit recovery to job reinstatement, and back wages and benefits.  Section 31-51q renders the employer liable for "damages caused by such discipline or discharge, including punitive damages".  In other words, the crucial similarities which might support an analogy between the statutes on this point just are not there.  No language in section 31-51q even arguably limits the meaning of "discipline" -- and the different remedies available under the separate statutes strongly suggest that the meaning of "discipline" is expansive in 31-51q (and likely in 31-51m).

---

[16] Plaintiff does not concede that this is correct construction of section 31-51m.

For these reasons, summary judgment should be denied as to Count Four.

**X.**   **Conclusion**

For the foregoing reasons, defendants' Motions for Summary Judgment should be denied, except insofar as plaintiffs have already indicated.

> THE PLAINTIFF,
> EDWIN RODRIGUEZ
>
>
> By___/s/ Rosemarie Paine_____
>     Rosemarie Paine (ct15694)
>     JACOBS, GRUDBERG, BELT & DOW, P.C.
>     350 Orange Street
>     New Haven, CT 06503
>     Telephone No.: 203-772-3100
>     Facsimile No.: 203-772-1691
>     e-mail: rpaine@jacobslaw.com

**<u>CERTIFICATION</u>**

I hereby certify that a copy of the Plaintiff Rodriguez' Opposition to Defendants'

Motion for Summary Judgment was mailed first class, postage prepaid this 8th day of

October, 2004 to:

Jonathan H.  Beamon
Office of the Corporation Counsel
City of New Haven
165 Church Street
New Haven, CT 06510

Paul A. Morello Jr., Esquire
Donovan & Morello
154 West Street
Building 3
Cromwell, CT 06416

R. Edward Phillips, Esquire
Miller & Phillips
One Union Plaza
Second Floor
New London, CT 06320

      /s/ Rosemarie Paine
Rosemarie Paine