# EXHIBIT A

Case 3:01-cv-00592-MRK    Document 131-2    Filed 10/12/2004    Page 1 of 13

```
CASE NO:  CV 00-0496678     :  SUPERIOR COURT

STATE OF CONNECTICUT        :  JUDICIAL DISTRICT OF NEW HAVEN

VS.                         :  AT NEW HAVEN

BRIAN SULLIVAN              :  SEPTEMBER 30, 2003
```

B E F O R E:  HONORABLE ROBERT J. DEVLIN, JR.

A P P E A R A N C E S:

REPRESENTING THE STATE OF CONNECTICUT:

JOHN F. BLAWIE, ESQUIRE - SENIOR ASSISTANT STATE'S ATTORNEY

REPRESENTING THE DEFENDANT:

HUGH F. KEEFE, ESQUIRE

(EXCERPT)

2

E D W A R D   K E N D A L L,
of 560 Silver Sands Road, East Haven, Connecticut, having been
first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. BLAWIE:

    Q   Good morning, sir.

    A   Good morning.

    Q   Are you currently working?

    A   Yes.

    Q   And where do you work, sir?

    A   I work for the Department of Correction as a correctional counselor.

    Q   And prior to doing that, what kind of work did you do, sir?

    A   I worked for the New Haven Police Department.

    Q   For how many years?

    A   Approximately, 23.

    Q   And could you tell the ladies and gentlemen of the jury what's your history, starting with when you first were sworn in with the department?

    A   I spent about three or four years in patrol. I then went up to the Detective Division. I worked in street crime, narcotics. I went over to the Statewide Narcotics Task Force after that. After completing that, I went to the Federal Gang Task Force, and then I was promoted to sergeant, went over back to the Detective Division, became second in charge of the Detective Division.

    Q   What year were you sworn in, sir?

    A    1996.

    Q    And is that -- is that case number unique to this case?

    A    It's the case number, I believe, that was given to Detective Flynn and Coppola at the time they began investigating the incident.

    Q    And what does that line entry reflect there, sir?

    A    That they had taken a statement by Reynaldo Martinez, and it was submitted in to be typed on March 2, 1998.

    Q    Having that date, sir, the March 2, 1998, for submission to be typed, do you recall if your conversation with the defendant about getting the statement typed and giving him an update, would that have occurred before or after the 2nd of March?

    A    It would have to be before.

    Q    And why do you believe that?

    A    Because we had discussed having it typed up, having it transcribed.

    Q    And did you take any specific action with respect to getting this statement typed up?

    A    Yes. I went to the typing pool and asked them to put a priority on it.

    Q    What is put a priority on it mean?

    A    Per my request, you know, to take care of it right away.

    Q    And when was that statement completed, sir?

    A    March 4, 1998.

        MR. BLAWIE: Could we take our morning recess here

A   I brought it up to my office.

Q   And what did you do with it in your office?

A   I glanced over it quickly, took a look at it, and I held on to it.

Q   And what was your purpose in holding on to it?

A   To have a meeting and brief the captain on the statement.

Q   Well, there's two things in that, that you just said. Which came first? Did you brief the captain on that statement or did you have a meeting?

A   I briefed the captain, told him we had gotten the statement typed up, and I scheduled a meeting.

Q   When you briefed the captain, where did that take place?

A   I can't recall. I would believe it's his office or my office, but I think it was his office.

Q   You were in and out of each others' offices frequently?

A   All the time.

Q   And when you say the captain, you're referring to the defendant, of course?

A   Captain Sullivan.

Q   And when you say you briefed him, what did you tell him?

A   I told him I had the statement typed up, it looked really good, and I wanted to have a meeting with the detectives and him.

Q   Is this the second time you've discussed the statement

with the defendant?

A   Yes.

Q   At this point, you do have the statement typed in-hand?

A   Yes.

Q   When you say you briefed him, what did you tell him about the statement?

A   I told him the statement was typed up. I looked at it. It looked real good, and that I wanted to have a meeting.

Q   Was it clear what case -- Did you make it clear what case this statement referred to?

A   Yes. Because when I told him about the meeting, I told him it was the statement that was taken by Detective Rodriguez and Detective Coppola.

Q   And how was the next -- You said you wanted to have a meeting set up or scheduled?

A   Yes.

Q   And how did that occur?

A   We set up a meeting for -- during the -- After the lineup that takes place in ISU, to have a meeting with Rodriguez, Coppola, Rodgers, myself, and the captain.

Q   When -- The statement was typed and completed on March 4. Do you remember specifically what day you had removed it from Detective Coppola's file?

A   No.

Q   Do you remember whether it was during the day shift or the evening shift?

A   During the day.

Q    And would Detective Coppola have been at work at that point?

A    No.

Q    And when -- when is the typing of these transcripts normally done?

A    During the day.

Q    And how long after you had the briefing with the defendant did you have that meeting you've described, the next meeting?

A    I can't tell you exactly because of the time that's expired, but it was probably within a few days.

Q    A few days of -- If it was completed on the 4th, a few days after the report was completed or a few days after you met with the defendant and briefed him on the statement?

A    A few days after I met with Captain Sullivan to brief him on it.

Q    And who was present at that meeting?

A    Captain Sullivan, Sergeant Rodgers, Detective Rodriguez, Detective Coppola, and myself.

Q    And where did that meeting take place?

A    It took place in the conference room.

Q    Next to the defendant's office?

A    Yes.

Q    And what was the purpose of that meeting?

A    To go over the statement and the information that they had developed in the case.

Q    And what happened at that meeting, Sergeant?

A    We sat down at the table, and Detective Coppola and Rodriguez started to explain that they had information, that they had information to get a search warrant, and at that time, the captain announced that he was going to go down to the chief's office to talk with the chief.

Q    And did he do so?

A    Yes.

Q    And what happened when he went down to the chief's office or do you know if he went down to the chief's office?

A    Well, he walked out and left the Detective Division.

Q    In what direction?

A    Towards the chief's office.

Q    And what about the -- At this point now, there's four of you in the room?

A    Yes.

Q    Does -- Do you wait for him there?  Does the meeting break up?  Tell us what happened?

A    We wait, and they are -- they are -- We waited for him to come back.  We were in there.

Q    And what happened?  How long was he gone?

A    I can't recall the exact amount of time.

Q    Can you give an estimate?

A    Five, ten minutes.

Q    And were you -- were you with him at any time during the five or ten minutes he was gone?

A    No.

Q    And what happened?  At some point, did he return?

A   Yes.

Q   And what happened then?

A   He announced, per order of the chief, to hold off on the investigation.

Q   And how did he say that?

A   He said it -- It was coarsely. It was like, you know, he was -- you know, like he was told to hold off on it. You know, he was like -- You know, he was upset.

Q   He was upset?

A   It seemed like he was upset, yeah.

Q   And how did he -- How -- What led you to the conclusion that he was upset?

A   Well, we tried to continue on, and you know, he said just hold off on it, and you know, Detective Coppola, Detective Rodriguez were trying to push the issue a little bit because they had information, and we were just told to hold off on it.

Q   Did he give a reason other than per order of the chief?

A   No.

Q   Do you know whether, in fact, the chief ordered this investigation halted?

A   No.

Q   Did the defendant offer any explanation of the order?

A   No.

Q   Did he give you any whys? In other words, do you understand by whys, meaning why the investigation was being halted?

A   I didn't.

Q   When you say you didn't, what do you mean?

A   I learned that the -- I learned that they were looking for the tape and the statement for the State's Attorney's Office and that was in 2000.

Q   So from 1998, is that when the meeting happened? The meetings happened sometime around late February or early March, based upon the logs we have in evidence, and is that -- is that the time frame for the meetings with the hold off and hold on to it?

A   Yes.

Q   Okay. Until 2000, March of 2000?

A   That's correct.

Q   Did you have any other conversations with the defendant about this statement or the Cusick homicide investigation?

A   No.

Q   In that intervening two-year period?

A   No.

Q   And where during those two years was the tape and the statement, Sergeant?

A   In my possession.

Q   And why was it in your possession?

A   Because I was asked to hold on to it.

Q   Is holding on to evidence in a murder investigation against a number of department rules and regulations?

A   What's that question again?

Q   Sure. You indicated you were asked to hold on to

evidence; correct?

A   That's correct.

Q   That statement is evidence in a homicide, is it not?

A   Yes.

Q   Okay. Does the holding on to evidence in your desk, like you did, violate any rules or regulations of the department?

A   I've been told that it does. However, it's a normal practice, every single day practice in the New Haven Police Department Detective Division to hold on to statements, to hold on to tapes, to hold on to reports.

Q   So did you believe you were violating any rules by complying with the defendant's order?

A   No.

Q   Why didn't you put the tape back into the evidence room?

A   Because I thought, shortly, I would hear back and would be meeting with North Haven to move on with this investigation.

Q   And did that happen?

A   No.

Q   The next time you had occasion to -- Well, did you think about that tape and statement being in your office during those two years?

A   No. I lost track of it. Never ever thought about it.

Q   At some point, you testified you left ISU to go to the B of I?

Q   Is that what you're saying?

A   Yes.

Q   You said you met with North Haven detectives about the Martinez statement and went over it with them and you didn't?

A   That's correct.

Q   And, sir, these originals of statements, in other words, you say there were other originals besides the Martinez original in your desk?  Yes?

A   Yes.

Q   And we've had evidence here, the originals are suppose to go to the record room.  It's not true?

A   It's not true.

Q   I mean, God forbid, something happens to you.  Aren't these things suppose to be kept in a central location for other people to have access to, rather than go rummaging through your desk looking for them?

A   It's just a common practice.  I was brought up that way in the Detective Division.  That's the way it's been done.

Q   And you told Dearington that the tape was missing from the property room; right?

A   Yes.

Q   And you told him items are commonly missing and commonly lost in the evidence room; right?

A   Yes.

Q   Is that true?

A   We've lost a number of tapes.

Q   You also told Sullivan about this meeting you had with

```
CASE NO:  CR 00-0496678        :  SUPERIOR COURT

STATE OF CONNECTICUT           :  JUDICIAL DISTRICT OF NEW HAVEN

VS.                            :  AT NEW HAVEN

BRIAN SULLIVAN                 :  SEPTEMBER 30, 2003
```

C E R T I F I C A T E

This is to certify that the foregoing is a true and accurate transcript of the above-entitled matter, electronically recorded by me, heard in the Superior Court, 235 Church Street, New Haven, Connecticut, before the Honorable Robert J. Devlin, Jr.

This certification page is invalid if it does not contain an original signature.

Dated at New Haven, Connecticut, this 8th day of March, 2004.

*Christine Bachman*

CHRISTINE BACHMAN

COURT MONITOR