# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

EDWIN RODRIGUEZ               CONSOLIDATED

V.                            CIVIL NO.3:01CV 592 (SRU)(lead)

THE CITY OF NEW HAVEN, ET AL

STEPHEN COPPOLA               CIVIL NO.3:01CV 813 (SRU)(lead)

V.

MELVIN WEARING, ET AL     AUGUST 9, 2004

DEPOSITION OF MELVIN WEARING

A P P E A R A N C E S:

   MILLER & PHILLIPS, LLC
      Attorney for the Plaintiff
      One Union Plaza, Second Floor
      New London, Connecticut 06320
   BY:  ED PHILLIPS, ESQ.

   CORPORATION COUNSEL, CITY OF NEW HAVEN
      Attorney for Defendant Melvin Wearing
      165 Church Street
      New Haven, Connecticut 06510
   BY:  JONATHAN BEAMON, ESQ.

   JACOBS, GRUDBERG, BELT & DOW, PC
      Attorney for Edwin Rodriguez
      350 Orange Street
      New haven, Connecticut 06503
   BY:  ROSEMARIE PAINE, ESQ.

REPORTED BY:
QIANA M. BURGESS
LICENSED SHORTHAND REPORTER
LICENSE NO. 327

QIANA MYLESE BURGESS, RPR, LSR
P.O. Box 3113
New Haven, Connecticut 06515
Telephone (203) 387-8398

stand by that prior testimony, or is there anything you want to change?

A. Nothing I want to change.

Q. Okay. While you were the chief of police for the city of New Haven, what were your primary duties?

A. To make sure that the New Haven Police Department operated in an efficient and effective manner as possible.

Q. And what was the source of your authority as the chief of police?

A. I was responsible for the overall operation of the department, which involves hiring, disciplinary actions, and just overall supervision of the department.

Q. I apologize. My question may not have been worded well. Was the source of your authority as chief of police from a statute or a policy manual or something else?

A. I think the statutes relating to chief of police, but it's policy, you know. I was appointed by the mayor of the city of New Haven.

Q. Before you were appointed by the mayor to be the chief of police had you ever served as assistant chief of police?

A. Yes, I had.

Q. All right. Do you recall what years you served

Q. Does the Board of Commissioners carry out all disciplinary actions against police officers?

A. Not all. Only those cases that prefer charges to the Board.

Q. Chief Wearing, John Minardi testified earlier in this matter that there was a time in which a captain of the New Haven Police Department was suspected of improper conduct with regards to the evidence locker and selling some things to third parties outside the department.

A. Uh-huh.

Q. Are you familiar with that situation?

A. Yes.

Q. Okay. Now, Mr. Minardi testified that he wanted to commence an internal affairs or internal values and ethics investigation into that captain and you prevented him from doing that, or are you aware of that?

A. No. I'm the chief and I give direction in the department. And it was my call if I wanted to do that or not. It's not Minardi's call to do that.

Q. Okay. For the purposes of this question, I want to assume that Mr. Minardi had gone to you and you told him no, we're not going to do an investigation. Now, my question is if Mr. Minardi had thought that to

be an unlawful order or improper, should Mr. Minardi have reported that to the assistant chief of police?

MR. BEAMON: Object to form of the question. You can answer it if you understand it, Chief.

THE WITNESS: Yeah, I can answer that. I ordered the investigation, and it was my call. I had no reason to stop or hinder the investigation at all, because it was my call. There's no investigation that's lodged in the department in terms of an internal affairs investigation without my authority. There's no independent investigation carried out by detectives or people who are assigned without my acknowledgement.

MR. PHILLIPS: So if Mr. Minardi thought you had given him an unlawful order, should he have reported that to the assistant chief of police?

MR. BEAMON: I would, again, object to form.

THE WITNESS: He could have. That was totally up to him, as always, the position to go to take it to another level. I have no problem with that at all if there was something

a case on this. Let's investigate and see what's happening here.

Q. So if I understand you correctly, other than the chief of police no one else has the authority to begin an internal affairs investigation?

A. That's correct.

Q. Okay. You testified earlier that the Board of Police Commissioners would carry out disciplinary actions to those cases that you preferred charges to them; is that correct?

A. That's correct.

Q. Okay. What types of cases would you prefer to the Board of Police Commissioners?

A. If there is an egregious action taken by an officer, such as involving drug activities or criminal activities, anything that would involve a suspension over 15 days. I would prefer those cases to the Board of Police Commissioners.

Q. Now, you just stated that one of the types of cases you would prefer to the Board of Police Commissioners would be criminal activities. Would you send a case wherein you suspected a member of the police department to be committing a criminal act, would you send that anywhere else other than the Board of Police Commissioners?

A.  I would involve the State's Attorney's office.

Q.  What other types of things would you send to the State's Attorney's office?

A.  Any criminal matters would go to the attention of the State's Attorney.

Q.  So the types of cases you would send to the Board of Police Commissioners, you stated egregious actions, for example, drug activities, criminal activities or any cases where a suspension over 15 days would be imposed. Those types of cases you would send to the Board of Police Commissioners, correct?

A.  That's correct.

Q.  Okay.

A.  Also -- I mean, all criminal cases goes to the State's Attorney's office and is dealt with in a criminal sense, in a criminal matter. There's also administrative involved in terms of rules and regulations of the department. The Board of Police Commissioners handle those cases internally.

Q.  So the Board of Police Commissioners would handle cases dealing with suspected violations of police department policy?

A.  That's correct.

Q.  Okay. Would they handle all cases of violations of police department policy?

A. Yes.

Q. Detective Keith Wortz also testified previously in this case. He -- and I don't have his exact language -- but the gist of it was that Captain Brian Sullivan had told him to stop his investigation of the Cusick homicide and to not communicate further to the North Haven Police Department. You were not the chief of police at that time. I believe you were the assistant chief of police. Should Mr. Wortz or Detective Wortz have come to you to inform you of that conversation?

A. Absolutely.

Q. Okay. Do you know if he had come to you and reported that?

A. No, he had not.

Q. Okay. What could you have done had he come and reported that to you?

A. I would have gone to the chief and advised the chief of the same. And I would have gone to Captain Sullivan and made sure that he followed through with the investigation. That's a no brainer.

Q. Okay. Now, Detective Wortz had testified that Captain Sullivan had told him per order of Chief Pastore, Stop the investigation, the chief doesn't want this murder to come back to the City of New Haven. My

A. During my tenure when I operated.

Q. So during your tenure, if I am correct, if somebody felt an IA investigation should go on, they would have to come to you. And you would either approve it or disapprove it.

A. I would never hinder or stop an investigation. But I certainly want to be apprised of what is going on with a member of the department. So the IA supervisor would automatically come to me and advise me of what's going on. And I always say, Let's see where it takes us.

Q. So if I understand you correctly, you're saying during your tenure as chief, you're saying you never decided any investigation should not go forward?

A. That's correct.

Q. So anytime somebody came to you, you said, Let's see where the investigation takes us?

A. That's correct.

Q. How many investigations during the time you were chief did you initiate independent of anybody coming to you?

A. I don't have those numbers.

Q. Okay. With respect to Detectives Coppola and Rodriguez how many investigations did you independently initiate?

me withdraw that.

You mentioned that there were three entities that an officer could go to if he or she believed that the chain of command was not acting with legal authority, correct?

A. That's correct.

Q. And these three would be the Board of Police Commissioners, the Mayor's office, and the State's Attorney, correct?

A. I believe I also mentioned the assistant chief as well. And the chief.

Q. Okay. But we're talking about -- by chain of command I mean the chain of command within the New Haven Police Department, okay.

A. Okay.

Q. So you would agree with me the three entities: Board of Police Commissioners, Mayor's office, and the State's Attorney are outside of the chain of command that a New Haven police officer could go to if they believed the chain of command within the department was not acting with legal authority, correct?

A. That's an avenue.

Q. Okay. Any other avenues?

A. It should have been dealt with internally. The officer should have gone to the assistant chief or come

directly to my office.

    Q. If the officer -- I'm not talking about this specific investigation at this point. If an officer believes that the chain of command inside the New Haven Police Department is not acting with legal authority in what they're doing, the three avenues that they can pursue would be the Board of Police Commissioners, Mayor's office, and State's Attorney, correct?

    A. That's correct.

    Q. Of the three, who would you say would have the better investigation wing in order to possibly solve or investigate a crime?

        MR. BEAMON:   I'm going to object to the form.

        MS. PAINE:   You can answer.

        THE WITNESS:   Well, in this particular case --

        MS. PAINE:   I'm asking just in general. In terms of investigation of a crime and pursuing a criminal or a criminal investigation, which of the three entities would have the better investigative services wing?

        THE WITNESS:   Obviously, it's State's Attorney's office.

that, correct?

    A.   Absolutely.

    Q.   I'm going to ask you to take a look at what we're going to mark as evidence. And what I'm going to need to do is just make a copy of this, because it's two sided. So I'm going to excuse myself just to make a quick copy.

           MR. BEAMON:   Is it okay if we take a short break?

           MS. PAINE:   Sure.

           (There was a recess taken.)

           (Plaintiff's Exhibit 2 was marked.)

BY MS. PAINE:

    Q.   Chief, have you had a chance to take a look at that?

    A.   Yes.

    Q.   Okay. Do you disagree with what is stated in that memo?

    A.   I totally disagree with this.

    Q.   Okay. Tell me everything you disagree with. We can take it line by line or paragraph by paragraph.

    A.   Sergeant Minardi and Kearney, both supervisors, they were investigating this particular case. And they kept me apprised of the progress in the case. They never once asked me to give a statement. To be honest

with you, because they are my subordinates they probably would not have asked me anyway. I testified to this before. This is a fabrication. This is a lie.

Q. Let me back up. You mentioned that they were keeping you apprised of the investigation; is that right?

A. That's correct.

Q. Okay. Can you please describe how they would keep you apprised? First of all -- let me withdraw. I take it this investigation was of particular sensitivity?

A. That's correct, yes.

Q. Okay. Would it be fair to say you were keeping, then, pretty close tabs on the investigation?

A. Yes.

Q. Checking with those folks daily as to what was going on with respect to the investigation?

A. I don't know if daily. But, you know, regularly.

Q. Regularly. Okay. What would -- regularly meaning when Minardi and Kearney are on?

A. Yes. When they had something to report to me they would bring it in. If they took a statement or whatever the statement said.

Q. Where is any investigative file as the

# CERTIFICATION

I, Qiana M. Burgess, a Notary Public within and for the State of Connecticut, do hereby certify that the deposition of MELVIN WEARING was taken before me pursuant to Notice at the offices of JACOBS, GRUDBERG, BELT & DOW, PC, 350 Orange Street, New Haven, Connecticut on August 9, 2004 at 9:45 a.m.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the events of said cause.

Dated at New Haven, Connecticut, this 10th day of August, 2004.

Qiana M. Burgess
Notary Public
License No: 327

My Commission Expires:
March 31, 2004