# EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

EDWIN RODRIGUEZ            CONSOLIDATED

V.                        CIVIL NO.3:01CV 592 (SRU)(lead)

THE CITY OF NEW HAVEN, ET AL

STEPHEN COPPOLA           CIVIL NO.3:01CV 813 (SRU)(lead)

V.

MELVIN WEARING, ET AL    AUGUST 2, 2004


DEPOSITION OF STEPHEN COPPOLA

A P P E A R A N C E S:

        MILLER & PHILLIPS
            Attorney for Stephen Coppola
            One Union Plaza, 2nd Floor
            New London, Connecticut 06320
        BY:  WARREN MILLER, ESQ.

        CORPORATION COUNSEL, CITY OF NEW HAVEN
            Attorney for Defendant Melvin Wearing
            165 Church Street
            New Haven, Connecticut 06510
        BY:  JONATHAN BEAMON, ESQ.

        DEL SOLE & DEL SOLE, LLP
            Attorney for Wortz, Minardi and Kearney
            46 South Whittlesey Avenue
            Wallingford, Connecticut 06492
        BY:  RENE GERARD MARTINEAU, ESQ.
        APPEARANCES CONTINUED.

                    REPORTED BY:
                  QIANA M. BURGESS
            LICENSED SHORTHAND REPORTER
                  LICENSE NO. 327

            QIANA MYLESE BURGESS, RPR, LSR
                    P.O. Box 3113
            New Haven, Connecticut 06515
                Telephone (203) 387-8398

A P P E A R A N C E S: (CONTINUED)

    ALSO PRESENT:
    JACOBS, GRUDBERG, BELT & DOWN, PC
          Attorney for Edwin Rodriguez
          350 Orange Street
          New Haven, Connecticut 06503
    BY:  ROSEMARIE PAINE, ESQ.

                    THE WITNESS:    Yes.

BY MR. MARTINEAU:

Q.  In what manner?

A.  Well, they took me and my partner, Derek Rogers all back to back.  But when it came time to take Sullivan and Kendall's, they didn't do that.

Q.  Anything else besides the manner that they took statements that you took offense to?

A.  Well, I also -- not them, but I also knew that Sullivan was made aware that there was going to be an IA investigation prior to an IA investigation.

Q.  You knew there was an IA investigation going on when you received the letter advising you that you had to come down to give a statement.

A.  Not until I got the statement -- not until I got the letter.

Q.  All right.  But at that point you were aware that there was an IA investigation going on, correct?

A.  Going to start, yeah.

Q.  Okay.  Were you aware of anyone else who had been interviewed prior to you in that IA investigation?

A.  I was the first.

Q.  Okay.  And when you received the notice of the IA investigation, how much time was there between you receiving notice and you giving the statement?

believe.

Q.   And at that point you received this notice.
What do you do?

A.   Contacted Darington.

Q.   Okay.  So you contact --

A.   It was either him or Reardon I spoke to first
at the office.

Q.   Okay.  But you remember speaking to both of
them prior to submitting to the interview?

A.   Yes.

Q.   Okay.  All right.  And do you actually meet
with them prior to submitting to the statement?

A.   Yes.

Q.   Okay.  And where was that meeting held?

A.   At his office.

Q.   Okay.  And was that the day before -- was this
meeting the day before your submission to a statement to
IA?

A.   Yes.

Q.   Okay.  And what does -- approximately when does
this meeting occur?

A.   As soon as I come into work, I got the letter.
I saw what it was about.  And we went over to
Darington's office.  Eddie and I both went.

Q.   So you both received the letters?

Q.  Okay.  What does Michael Darington tell you relative to the IA investigation?

A.  Well, he advised us there was a gag order on.

Q.  And gag order, your understanding, is issued from whom?

A.  Him.

Q.  So he has issued a gag order?

A.  To my knowledge, yeah.  That's what he said.

Q.  So Michael Darington tells you there's a gag order in place as to your testimony; is that correct?

A.  That's correct.

Q.  Okay.  Does he at that point provide you any documentation?

A.  No.

Q.  Okay.  And what does he advise you relative to this gag order?

A.  He doesn't really advise me of any -- just advises me there's a gag order.  But he told me that he couldn't tell me what to say and what not to say during an IA investigation.  He wasn't happy there was an IA investigation going on.  And to my knowledge, I believe he tried to stop it.

Q.  Does -- did he make any attempts to stop it while you were present?

A.  Not to my recollection, no.

Q.   And does he indicate to you during this conversation of what he envisioned doing to try to prevent this IA investigation?

A.   From what I remember, I believe they tried to contact a judge somewhere and he was going to run the scenario past a judge, that he had his own investigation going on at that time.  And now the chief of police was running an Internal Affairs investigation parallel with his and he wasn't happy with it.  And he was going to try to see if he could get it stopped.

Q.   Okay.  At any point prior to your being interviewed by IA, all right, did you receive anything in writing that advised you that you were not to speak to IA?

A.   No.

Q.   Okay.  How did Michael -- so Michael Darington informed you there was a gag order.  His understanding is there's a gag order in place, correct?

A.   Correct.

Q.   But he doesn't advise you what to do relative to that gag order; is that correct?

A.   That's correct.

Q.   All right.  And he indicates to you that he is anticipating seeking an order from a judge relative to this issue?

Q.  And your understanding of the gag order is that you're not to talk?

A.  Correct.

Q.  And this is about -- I just want to clarify this.  The gag order, I assume, that you understood it -- and if it's different, please advise me -- but this had to do with whether or not evidence was being withheld in the manner of the investigation relative to Sullivan's handling of this matter.  Is that a fair understanding of what your understanding of the gag order was?

A.  My partner and I provided Darington with statements pertaining to his investigation already.

Q.  Correct.

A.  And he advised us that when he took the statements from us that he was going to lock the statements in his safe, and that no one -- he didn't want anybody to know in the police department that we supplied him with these statements in fear of some type of retaliation.

Because Eddie and I had to go there and work every night.  And he didn't want to cause any confusion in our department with superiors with us going over there and supplying statements.  So he said there was going to be nothing said in his office as far as us giving

Q.   Anyone else that you're aware of?

A.   I'm not sure.  I don't recall.

Q.   Okay.  Other than that difference between the statement that you gave to the State's Attorney relative to the photo array and IA, was there anything else that you recall being different between the statement you gave to the State's Attorney and IA?

A.   I'm not sure.  I don't recall.  It might have been one other thing.  I'm not sure.

Q.   Okay.  All right.  Did you provide the State's Attorney with any other documentation besides your own -- giving your own statement to them?  Did you give them any other documents?

A.   Yes.

Q.   What?

A.   I gave them the photo board that I saved.

Q.   Okay.  All right.  And that was at the meeting with Michael Darington?

A.   I gave that to Tim Reardon.

Q.   Before?   .

A.   Yes.

Q.   Okay.  All right.

A.   Excuse me.  Before what?

Q.   Before the meeting -- before the day -- before the IA investigation when you were with Michael

Darington.

A.   I gave that to Reardon when we gave him the
statements, I believe.

Q.   All right.

          (There was a recess taken.)

BY MR. MARTINEAU:

Q.   I'd like to go back and follow up a couple
questions before from your testimony.  Sir, how did you
become aware of the incident involving John Minardi and
Keith Wortz relative to the fight and Jose Rivera?

A.   I saw the report.

Q.   Okay.

A.   I mean, people knew about it through the
department.

Q.   Okay.  And did you acquire a copy of this
report?

A.   That's correct.

Q.   Okay.  Where did you acquire it?

A.   I don't recall where I got that from.

Q.   When did you acquire it?

A.   I don't know.  Within the year or so.  Within
the last two years, something like that.

Q.   And you don't recall where you got it, though?

A.   Yeah.  I don't remember where we got it.

Q.   All right.  Sir, other than the information

we've already talked about relative to the facts that you're aware of between Melvin Wearing and John Minardi and Brian Kearney, do you have any specific evidence, either documents or witnesses that John Minardi or Brian Kearney were acting in concert with Melvin Wearing when they launched the internal investigation against you and Ed Rodriguez and filed disciplinary actions?

           MR. MILLER:    Objection.  What do you mean by launched?

           MR. MARTINEAU: I'll strike that.

    BY MR. MARTINEAU:

Q.  Sir, do you have any specific evidence that either John Minardi or Brian Kearney was acting in concert with Melvin Wearing relative to the IA investigation?

A.  Just from what I seen with my own eyes.

Q.  What specifically did you see with your own eyes?

A.  I knew that everyday they were reporting to him after an internal affairs statement.  And I knew that Wearing was being kept abreast of what was going on.  So Wearing knew what we were saying.

Q.  How were you aware of when they were reporting to Melvin Wearing that they were discussing the IA investigation?

A.   Because everyone was talking in the police department what was going on.  And I was catching that loop too.

Q.   Okay.  What were you hearing from the department during the IA investigation?

A.   Just that Wearing -- Minardi and Kearney were reporting to Wearing daily on everyone's statement and what was being said.  Sullivan was in Wearing's office every night when I came in.

So, I mean, you know, I'm a homicide investigator. So I knew pretty much what was going on.  There was a lot of animosity there.  People weren't talking to each other.  Sullivan wasn't talking to me anymore.  Chief wouldn't say hello to me and Eddie anymore.  At one point in time when Sullivan is released,  the chief stops me and my partner down in the basement and says, "Are you happy now?"  I didn't do anything wrong, sir.

Q.   Sir, did John Minardi ever tell you that he was acting in concert with Melvin Wearing in conducting the IA investigation against you and Edward Rodriguez?

A.   He never told me, no.

Q.   How about Brian Kearney?

A.   The only thing Kearney said to me was that during the IA investigation, he approached me.  I was out on the floor in the detective bureau.  I was with

Sergeant John Veleka.  Kearney approached me and wanted
to talk to me about the IA investigation.

I said, "I don't have any representation here.  I
don't have anything to say to you."

He said, "No, no.  Listen to me."  He said, "If you
didn't go outside the police department, you wouldn't be
in trouble."

Q.  Those were his exact words?

A.  Exact words.  Pointed, "If you didn't go
outside the department, you wouldn't be in trouble."
That was before the thing was even concluded.

          MS. PAINE:    This is Kearney?

          THE WITNESS:    Kearney.  That was like, I
          believe, within days or weeks after I gave a
          statement.  So I knew automatically from jump
          street, as we say on the street, that they were
          looking for fault people and that was me and my
          partner.

BY MR. MARTINEAU:

Q.  Okay.  I'm going to just show you an
incident -- a New Haven Police Department statement and
it's Page 1 through 80.  I'm just going to have you look
at this briefly.  And we've talk about your interview
with IA and you gave a statement under oath.  Is that a
copy of the document that we're talking about?

weren't transferred over?

A.   I don't know.

Q.   Okay.  Sir, at some point it's your claim that Captain Sullivan told you to stop investigating the Cusick homicide, correct?

A.   That's correct.

Q.   Okay.  And how soon after that instruction did you first contact the State's Attorney's office?

A.   Within days.

Q.   Okay.  And who did you contact at the State's Attorney's office?

A.   Inspector Dennis Kelly.

Q.   And did you know Inspector Dennis Kelly?

A.   Very well, yes.

Q.   Where had you first met Inspector Dennis Kelly?

A.   He was my supervisor when I first got my gold shield in the detective bureau.

Q.   Okay.  So when you first became a detective in homicide, he was your supervisor?

A.   Yes.

Q.   What was his position at that time?

A.   Sergeant.

Q.   Okay.  And did he retire to become an inspector at the State's Attorney's office?

A.   Yes.

Q. How long had he been an inspector for the State's Attorney's office when you first approached him relative to the stop investigation order?

A. I believe he'd been there for a few years. Three, four years maybe.

Q. Okay. Had you socialized with him during that time frame?

A. Just on a working basis.

Q. Okay. And so it's your best recollection now that you met with him several days after the stop order?

A. Within a day or so.

Q. Okay. And who accompanied you to this meeting?

A. Detective Rodriguez.

Q. All right. At the meeting where Sullivan told you to stop the investigation, did you in any way argue with Sullivan relative to that order?

A. No.

Q. Did you say anything, did you show any displeasure at all relative to that stop investigation order?

A. Not there, no.

Q. Okay. Why not?

A. Because he gave me an order and I obeyed it.

Q. Okay. Did you question him or whether or not that was a lawful order?

A.   No.

Q.   Did you believe it was a lawful order?

A.   At that time, yes.

Q.   Okay.  At what time did you, if at all, change that opinion that it was a not a lawful order?

A.   As things started to happen after that.

Q.   Okay.  All right.  And when you say things started to happen, what are we talking about?

A.   Well, what happens is that when I go see Dennis Kelly, I advise him of what happened, the conversation with Sullivan, what I had on the Cusick homicide.  I told Kelly I had the photo array.  And I said, "Sullivan cut us off."  I said, "I don't know why.  But, listen, we're all investigators here.  Something's messed up.  I don't know what's going on."

He said, "All right."  He said, "Secure what you have in your desk," pretty much quote, unquote, "and just do what you're told.  I'll take it from here.  And that was it.

Q.   Okay.  Now, how did you schedule that appointment with Dennis Kelly -- I'm sorry.  Were you finished, sir?  Go ahead, it's fine.

A.   So I do that.  I secure the photo array, okay.  And I don't know if you're aware of the circumstances of the tape and everything.  I had already placed the audio

cassette tape to be transcribed by the secretary.

Q.   Yes.

A.   When she gets through with that, she takes that cassette tape and she takes the original that she transcribed and places it in a file in a file cabinet with my name on it.  And she signs a log that shows the date I placed it in for her to transcribe.  And at the end she signs it off when it's done.

So I checked for a couple days.  It wasn't in there for a day or so.  And then I look and it's signed off. I look in my file, it's not there, it's missing.  The tape and the original transcription of that tape.

So now I start -- again, I'm a homicide investigator.  The wheels start turning.  He shuts me off.  Kelly tells me to hang on to what I have.  I come out of the transcription, the log room where it's kept, and I'm kind of ranting and raving, you know, doing my thing.  I'm hot.  My tape is missing, what's going on.

I have -- Derek Rogers comes out.  He's kind of a nervous supervisor, "You got to calm down.  You're hot headed."

I said, "Listen, I have put a tape in here to be transcribed.  It says it's transcribed and it's missing out of my file."

This guy cuts us off.  "What's going on here?"

Eddie Kendall comes out of his office.  He hears the conversation.  He says, "What's the matter here?  What's the matter?"

I said, "Listen, I put the Cusick tape in there to be transcribed.  Laura" -- I think it was Laura -- "transcribed it."  I said, "It's missing, it's out of my file cabinet."

He says, "I got it."

I said, "What are you doing with it?"

He said, "I want to review it."  Now, I know if he wanted to review that, he didn't need to take that tape out of there.  All he had to do was read the transcription, because it's verbatim what the tape says.  But this time he took both out.  And there was no other job that he ever did that to, okay.

So I said, "Well, I need it."

He said, "Well I want a copy of it."  Took the tape, took the transcription, made two copies, gave him the original back.  Took the tape and placed it into evidence.

Q.  Okay.

A.  The rest is history.

Q.  All right.  So now as far the photo board, all right, it's your testimony you never placed that into evidence?

A.   That's correct.

Q.   All right.  Describe the photo board for me.
It had how many photographs on it?

A.   At that time we didn't have -- we have a
computer system now that you punch in, you get eight
photographs, you hit it, print on one piece of paper
there's eight photographs, four and four.  Okay.  That's
what you show witnesses, you know.

At that time we didn't have that system.  It was
the old system.  All our computer did was print out a
single picture of one person.  It didn't print out eight
on one sheet.

Q.   Okay.

A.   So in order to do a photo array, you had to
print eight separate pictures and we lay them out on the
table when you're doing the interview.  Is that person
who shot you in one of these pictures?  Yes.  Which one?
This one.  Sign it, date it.  Someone would sign it as a
witness.  That's the way that photo array was done.

Q.   And the one we're talking about in this case,
that's the way it was done?

A.   That's correct.  Now, that photo array isn't
normally put -- placed into evidence right away.

Q.   Why not?

A.   Because most of the investigators, especially

the old guys that broke me in, they used to hang on to
all of them.  The tapes go into evidence.  The photo
arrays were secured in your desk.  When you got through
typing an affidavit and everything was complete,
everything went downstairs into the property room all at
one time.

　　　　And one of the main reasons they used to do that
was because when you place that into -- they didn't want
anybody in the department seeing who their witness was,
because the witness signed it, and who they picked out
as a suspect.  It was done for security purposes within
the department.

　　　　So when you put it in, the day you took it or six
months or a year later, as long as you weren't done no
one ever checked and no one ever followed up on it.  And
do you know how I know that?

　　　　Q.  How do you know that?

　　　　A.  Because about a year ago they took a box out of
Mel Wearing's office.  And inside that box there was old
cases.  Two of them were murders from nine years ago.
And inside that box was all the tape statements and the
original cassettes and the original photo boards and.
They had them placed into evidence about a year ago.  I
know that, because I got a copy of the evidence form and
I got a copy of the report that was written by the

everyday.

Q.   Okay.

A.   These cases that come out of that office were nine-year-old unsolved homicides.  The tapes, the original photo boards, and the statements were in a box that big, that wide.  They brought it right in front of my desk.

Q.   All right.  Sir, do you maintain any photo boards in your desk now?

A.   No.

Q.   All right.  Do you log them in now in evidence?

A.   Yes.

Q.   Sir, after the order by Sullivan to stop the investigation, did you at any time talk to Melvin Wearing about that order before going to the State's Attorneys?

A.   No

Q.   Did you go to him?

A.   No.

Q.   Why not?

A.   Because Sullivan said he gave the order.  He implicated him in the shut off.

Q.   Okay.  Who was the assistant chief at that time?

A.   Douglas McDonald.

Q.   All right.   How was your relationship with
Douglas McDonald?

A.   I had a good working relationship with him.

Q.   Did you ever go to Douglas McDonald prior to
the State's Attorney relative to this stop order?

A.   No.

Q.   Why not?

A.   Because all three of them were best friends.
They golfed together, they drank together, they ate
lunch together, they smoked cigars together.  I watched
Wearing and Sullivan pulled out of the garage during the
IA investigation.  They were in each other's cars.  I saw
McDonald and Sullivan driving out.  It was no one I
could have went to in that place.

Q.   Were there any other supervisors you could have
consulted with?

A.   No.

Q.   Sir, at any time before going to the State's
Attorney did you consult with North Haven relative to
the results of your investigation?

A.   No.

Q.   Why not?

A.   Because it wasn't their homicide.

Q.   You were aware they were investigating this
homicide?

Q.  And what did Inspector Kelly tell you to do
with the information besides secure the evidence?

A.  Just obey your supervisor.  That's it.  Do what
you're told.  That's it.  I'll take care of it from
here.

Q.  And what was the next time you heard at all
from the State's Attorney's office?

A.  Not until several years later or a year or two
later, whenever it is.  I don't remember exactly.

Q.  Okay.  And who contacted you?

A.  Supervisor Tim Reardon.  He's a supervisory
inspector.

Q.  All right.  And how were you approached by Tim
Reardon?

A.  It was actually home framing my house.  I had a
three-week vacation.  I get a call from the State's
Attorney's office.  I figured it was about a case, not
that one.  "Steve, it's Tim Reardon.  How are you?"

"Good."

"I'm running into a little problem."

"Okay.  Can I help you?"

"Phillip Cusick homicide, okay.  I went down into
the property room looking for the tape, statements.  Did
you take" -- he's asking me these questions.

"Yes, I did."

"Was it ever placed into evidence?"

"Yes, it was."

"How about the photo array?"

"I have the photo array.  I have it secured."

"We need to talk."  And then I go down and end up talking to Reardon about it.  That's how Darington and Reardon and everyone find out about what happened.

Q.  Now, was inspector Kelly still working for the State's Attorney when Tim Reardon contacted you?

A.  Yes, he was.

Q.  Did you explain to Tim Reardon that you had already talked to Dennis Kelly?

A.  I gave him everything I gave you here today.

Q.  All right.  So you then meet with Reardon.  Was Detective Rodriguez with you also?

A.  Yes.

Q.  Okay.  And tell me how that meeting goes.

A.  Go in his office, you know, we sit down.  You know, asks us what happened.  I tell him how I came there a year or two prior, spoke to Dennis Kelly.  This is what happened.  We got shut down.  I saved the photo array.  He said, "Well "-- I wasn't sure if it was that time or the next time I talked to him.

He said, "Well, listen," one of the two times he says "I got problems.  I go down to the property room,

there's no record of a tape being placed into evidence. There's nothing there."

I said, "Well I don't know what to tell you. I remember I placed it into evidence." They eventually find out they have the evidence form, they placed it in, and it takes off from there.

Q. Did they tell you how -- what brought this back to light, this whole investigation after several years?

A. Yeah. I believe they said it was Officer Wortz.

Q. What about Officer Wortz?

A. He brought it to their attention or something or brought something to North Haven's attention. I think he went to North Haven first and picked up the witness, took the witness to North Haven, and then went to Darington's office and kind of made it sound like he broke the Phillip Cusick homicide. Not knowing it was solved two years prior.

Q. Sir, do you recall did you ever call Keith Wortz a rat?

A. I might have.

Q. And is it relative to this incident for him going to the State's Attorney's office?

A. No. We've had words before.

Q. Over what, sir?

C E R T I F I C A T I O N

I, Qiana M. Burgess, a Notary Public within and for the State of Connecticut, do hereby certify that the deposition of STEPHEN COPPOLA was taken before me pursuant to Notice at the offices of JACOBS, GRUDBERG, BELT & DOW, PC, 350 Orange Street, New Haven, Connecticut on August 2, 2004 at 10:10 a.m.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the events of said cause.

Dated at New Haven, Connecticut, this 24th day of September, 2004.

Qiana M. Burgess

Qiana M. Burgess
Notary Public
License No: 327

My Commission Expires:
March 31, 2009