# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

-----------------------------x

EDWIN RODRIGUEZ,

               Plaintiff,

        -versus-          :No. 3:01CV392(SRU)
                                (lead)

THE CITY OF NEW HAVEN, ET AL,

              Defendants.

-----------------------------x

STEPHEN COPPOLA,

               Plaintiff,

        -versus-         :  No. 3:01CV813(SRU)
                             (member)

MELVIN WEARING, ET AL,

              Defendants.

-----------------------------x

DEPOSITION OF:  JOHN MINARDI

DATE:  July 22, 2004 - 9:20 a.m.

HELD AT:  Jacobs, Grudberg, Belt & Dow
          350 Orange Street
          New Haven, Connecticut 06503


Reporter: LARRY DORFMAN, LSR #0067

SANDERS, GALE & RUSSELL
437 Orange Street
New Haven, Connecticut 06511
(203) 624-4157

A.    Did it go exactly how I thought it should go?  Not entirely.  Initially, the chief tried to put restraints on what we were doing. We struggled against that.  He wanted to know who we were interviewing and then didn't want us to interview people outside the department before he gave us permission to.  He withheld a little bit of the fact that he had Sullivan and Kendall ostensibly investigating themselves before we got involved, internal values and ethics unit, stuff like that.

There was a meeting we had with Jim Horan, Thayer Baldwin, he was corporate counsel at the time, where before we went to the meeting he had told us, ordered us not to speak, and then he gave his version of how the case was going which was not quite in line with our version.  He kind of left out he was a party of interest.  And we ended up at that time secretly meeting the same day with Thayer Baldwin to fill him in on the fact that the chief had done this.

Q.    All right.  I believe you said that you had to struggle against restraints that Chief Wearing had put on you?

A.    That's correct.

Q.    What kind of restraints?

A.    He wanted to have some say in what people we interviewed, what order we interviewed them.  You know, we wanted to interview North Haven, he made us wait until -- he told us not to interview anyone outside the department until he gave us permission to do so.

Q.    Is it your opinion that between or among you, Bryan Kearny and Denise Blanchard, you knew how to conduct a proper investigation?

A.    Yes.

Q.    All right.

MS. PAINE:  By the word you, you mean collectively the three?

MR. MARTINEAU:  Yes?

MR. PHILLIPS:  Yes, among those three people.

MS. PAINE:  Okay.

BY MR. PHILLIPS:

Q.    Is it fair to say that the way you wanted to run the investigation differed from the way Chief Wearing wanted to run the investigation?

A.    Yes.

Q.    Did Chief Wearing criticize you because

of the way you documented your investigation?

A.    Yes.   He did not like the memos that I would often write to the file when he made -- When he interfered with the investigation, I would make notes to the file.

Q.    Now, how did he interfere with the investigation?

A.    Like I said, you assign us to work a case.  I will try to break this down as best I can.  And he doesn't tell us -- he has full knowledge that Kendall and Sullivan went out with Jack Kelly, Attorney Jack Kelly, and had them start to do an investigation of themselves.  They even took a statement from one of the property clerks, her name I don't recall sitting here, in the presence of Jack Kelly.  He never discloses that to us.  We end up finding that out, I believe through a statement, and have to go and ask for this information.

We had wanted to interview Kendall and Sullivan, you know, like at the same time.  We were struggling with this issue with him.  I had to go for a minor surgical procedure and I was out for three days.  He forced the unit, Captain Kearny and Sergeant Blanchard, to interview

Sullivan when he knew I wasn't there to object.

He quickly stipulated they could record -- the union had been fighting for a long time wanting to record the statements that we take from people so they would have a copy as quick as they could get it. We had been fighting that for years. You don't want it to be implied that officers could have read each other's statements when they come to us. But he stipped that right off the bat.

He even -- one of the other things he used to use as a favorite threat of his was, it never worked, but he used to call us in and say stuff like, "You know you are still going to have to work for me even after the politicians are gone." You know --

Q.    Again, pardon this question, it may be rudimentary, but if I understand this correctly, Melvin Wearing wanted you specifically to come back to IA to do this investigation, correct?

A.    Yes.

Q.    But is it correct to say that Melvin Wearing wouldn't let you do your own investigation?

A.    Yes. All right. He would interfere.

I did the investigation whether he liked it or
not.

    Q.   Was it proper for him to interfere in
your investigation?

    A.   No.

    Q.   Did you ever challenge him on that?

    A.   Yes.

    Q.   When?

    A.   There is memos in that file.  Cases
before this that, back in the late nineties, we
had a case involving a high ranking police
captain, high ranking police official.  I will
say it was a captain.  He had ordered us not to
investigate the case, but we knew something
improper was going on, we had evidence of that.
There was a criminal element to the case.  As
much as there was a department one, there was a
criminal one, felony criminal.  Myself and then,
I don't know if Rick Randall, I can't remember if
he was a captain, began having secret meetings,
despite the chief ordering us not to do the case,
with the state's attorney.  We used to meet at
the Coffee Grind up in Hamden to conduct this
investigation.  The chief didn't learn about it
until there came a juncture where I believe

either the chief or the person we were investigating was going on vacation, one or the other was going to go on vacation after that, and this person would be left in charge of -- be allowed to continue to conduct criminal activity.

At that point, we had to have the chief notified. Obviously, he had to make -- or he didn't have to. He was the chief of police, he could do whatever he wants, but our feeling was he should, that this guy can't remain in that position much longer. God knows what he is going to do, especially without the chief around.

So Mike Dearington, who happened to be I believe in Wyoming at a dude ranch -- yes, I know it sounds funny now. The stress was incredible. We had to call him, basically tell him we had been meeting secretly with your guys and this is what we have and you need to do something before this guy goes on vacation, or whatever the circumstance was.

The chief was highly upset that we had done that. And again, he used that same threat. You can always speak to Rick Randall. He works over at Southern now, retired since, but he will tell you. But despite that, Rick used to tell

me, you know, John, if you don't get yelled at
once a week by the chief, you are not doing your
job.  It sounds like he was kidding, but he
wasn't.

It seemed like internal values and
ethics, you know, you would hope that the chief
would be the high point of ethics in your police
department, and it seemed we were always fighting
against him to do what was ethical and right
under the law.

Q.    Now, did the chief -- Withdrawn.

Did you get into trouble for having
secret meetings up in Hamden?

A.    You know, it's one thing to come right
after me, because I think I could have drawn a
pretty good case.  I would have probably had a
pretty good lawsuit if he had done that.  How it
comes, there are certain assignments in the
police department that people like, that people
strive for and work hard to try to achieve.  And
basically, any time I requested any kind of
assignment that I really wanted to do, his way
of, I believe, punishing me was to put his thumb
on it and make sure I didn't go there.  Internal
affairs, you don't win any popularity contests

there.

Q.    But other than not giving you the
assignments you wanted, did you ever get written
up?

A.    No.  I was pretty careful.  I mean, I
am always pretty careful about what I do.  I have
had perfect attendance for many, many years.  You
know, I followed through on the assignments I do.
Writing me up, he did ask Captain Kearny --
Captain Kearny disclosed to me, said the chief
asked him to look to see if they could get
anything on me after they transferred me out of
internal affairs after that case was done.  But
like I said, you are not going to hang anything
on me that -- you can try your best but, you
know, I cross my "T's" and dot my "I's".

Q.    You didn't get disciplined for going
outside the chain of command and having meetings
up in Hamden, did you?

A.    No.  He did threaten, but I guess, I
mean he had to know in his mind if he had done
something, it would have made it -- that may have
come out.  Obviously, it didn't come out until
this moment.  I have been sitting on this for
many, many years.  I do these investigations, I

Horan took any action on your reports of Chief
Wearing's interference?

A.    The only -- they used to kind of say,
"Be patient.  We are handling it," stuff like
that to us, but I couldn't ever see it
translating into any real restraints on the
chief's interference.

The only thing that Captain Kearny once
said to me after, he said they had compiled a
list, I never saw this list, showing who did what
wrong, and he said that the chief's list was the
longest one.  I have never seen this list.  I
don't know if there was any action ever taken on
the list.  I wouldn't mind seeing the list.

Q.    Would it be fair to say that although
Bryan Kearny was a captain in internal affairs,
you did the majority of the work on this
investigation?

A.    Yes.  I mean, remember, he didn't just
have this case.  He had this and every other case
that came in.  I think I may have helped him with
one or two other cases while this was ongoing,
but you know, pretty much this was my focus when
I was there.

Q.    Mentioned a Jack Kelly.  I believe you

stated that Jack Kelly had done an interview of
someone within the police department.

A.    It was one of the property room clerks.
One of the parts of the case is evidence
disappearing from the property room, and I guess
they had asked them all to be interviewed but
this one agreed.

Q.    Did you ever get access to that --

A.    We did get access.  It's somewhere in
the file, or should be somewhere in the file.

Q.    Did you get access to any other notes
or documents that Mr. Kelly created from his
investigation?

A.    We may have, but I don't remember.  I
can't recall.  Sitting right here, I don't
remember.

Q.    You testified earlier that Chief
Wearing, you said that he was an interested party
or party with interest?

A.    Party of interest.

Q.    What does that mean?

A.    Well, as we are interviewing the
detectives, they said that Sullivan had told them
the case was being stopped per order of the
chief.  I don't know at what point we figured out

information in his was not consistent. He even
wrote at the bottom of his first statement that
he wasn't consistent. I don't remember exactly
what he wrote, but something to that effect. I
think things began to unravel in terms of how the
thing was handled.

Q.   Now, you stated a few minutes ago you
would have to request to take another statement
from Captain Sullivan. Why would you have to
request to take a statement?

A.   That's a good question. Because I
think at that time the chief was still involved
with directing the case. Hadn't removed himself
yet.

Q.   Did Chief Wearing tell you the order of
statements to be taken?

A.   He was directing us, maybe with regards
to which detective we interviewed first, maybe
not that specific. He was very specific about
this group of people, then this group of people.
Also, "You can't go outside the department
without my permission. Don't go outside the
department until you take everybody's statement
here first."

        We wanted to interview North Haven. I

Q.    Were you removed from internal affairs before January 4, 2001?

A.    Yes.

Q.    Do you recall when you left internal affairs?

A.    I want to say either August or September of 2000. I think that, yes, I think it was August.

Q.    Do you like being associated with this investigation?

A.    The work we were able to accomplish I stand by. I would like to see the city and department take a closer look at what led to this and how could it happen.

Q.    Did you ever find an answer to that question, how did this happen?

A.    I don't think it was conclusive. It wasn't conclusive enough. I don't think we were able to determine whether it was just incompetence or criminal. And I think the larger question, which obviously there is not enough information to answer in this investigation, is how would it become acceptable for a police officer to act that way? I mean, in terms of when the top guy in the detective bureau and his

Q.   And this was the subject of your IA
investigation, to get to the bottom of really why
proper department procedures weren't followed, or
if department procedures were followed, and if
not, why?

A.   Right.

Q.   Do you think Chief Wearing's
involvement in the investigation impeded your
ability to get answers to those questions?

A.   At the time, yes.

Q.   Okay.  Do you think that the --
Withdrawn.

Do you think that the lack of timely
information turned over to the North Haven police
department -- Let me withdraw that.

Do you think the way the New Haven
police department handled the investigation of
the Philip Cusick shooting, including the delay
and withholding of information, do you think that
that affected the trial of the alleged shooter?

A.   Again, I would have to say you should
consult the state's attorney.  I don't know.

Q.   Fair enough.  Okay.  Can you explain to
me how the chain of command works both within the
New Haven police department and how that -- and

about my experience going to the state's
attorney, but you know, "You can go talk to these
people and maybe they can help you."

Q.    In your mind, if somebody was going up
the chain of command and the chain of command
wasn't handling it appropriately, it is
acceptable to go to the state's attorney to ask
for some relief or to request that things be done
properly?

A.    Depends on what you mean by
appropriately.  There is things that your boss
may do that you disagree with but you still do
because they are not illegal or, you know,
grossly unethical.  It's his opinion versus yours
and he is the boss and you do what he says.  If
it gets to the point where he is doing something
criminal, as it was in the case -- it took a
criminal incident for us to go way outside to the
state's attorney.

Q.    And back to that incident.  You made
Chief Wearing aware that there was a serious
possibility that a higher ranking captain, high
ranking captain, in his force was doing something
illegal, and you had to go to have these secret
meetings because you felt Chief Wearing was not

addressing the issue.

A.    He was specifically telling us not to.

Q.    He was ordering you not to pursue what
you felt was criminal felony activity committed
by somebody who was a high ranking captain in the
force?

A.    Yes.

Q.    And you were not disciplined in any way
or reprimanded for going outside of the chain of
command based on your actions in that case?

A.    No.

Q.    To your knowledge, was anybody with
respect to that investigation disciplined or
reprimanded for going outside the chain of
command?

A.    No.

Q.    Again, correct me if I am wrong.  I
want to make sure I am understanding your earlier
testimony.  So my question is, it's my
understanding from your earlier testimony that
you and Kearny had conversations with Baldwin and
Horan based -- because you felt Chief Wearing's
continued involvement in the case was
inappropriate or you had some concerns; is that
right?

Q.   When did he tell you?

A.   After the case.

Q.   You are looking at the beginning or middle or end when you found out about this list in terms of the life of the case?

A.   I would imagine it was at the end, though you can ask him.

Q.   Getting back to the IA complaint.  A final report gets prepared in this case or any case.  Where does it go and who determines who should be reprimanded or disciplined or referred for prosecution?

A.   Normally, it would go to the chief and then those determinations would be made.

Q.   Okay.

A.   In this case, I don't know who he addressed it to.  I didn't look at the file.

Q.   Okay.  You were off of the case by this point?

A.   Yes.

Q.   Do you know, then, other than reading this report, do you have any knowledge from talking to Captain Kearny or anybody else as far as what the chief's involvement was in reading this, reviewing this, deciding who deserved a

of command for Rodriguez or Coppola to go to the
North Haven police department, correct?

A.   You would have to know what they
believed at the time, and I don't know that.  If
they believed that the case was being stopped so
it wouldn't proceed again, I would say they
should go to -- it was a murder investigation,
for Christ's sake.

Q.   Would it be fair to say your personal
opinion is that if they believed that something
wasn't quite right in the New Haven police
department with respect to them pursuing the
murder investigation, they could go to the
state's attorney and bring them the problem and
request that it be investigated?

A.   Yes, that would be their duty.

Q.   So in this case, you know that
Rodriguez and Coppola did go to the state's
attorneys office and request investigations; is
that correct?

A.   I didn't learn that until much later.

Q.   You don't see anything wrong with that?

A.   No.

Q.   In fact, that's what you feel should
have been done?

A.    Yes.

Q.    Okay.  There is also in the next paragraph that starts:  "Captain Sullivan, Sergeants Kendall and Rodgers and Detectives Coppola and Rodriguez all withheld evidence from the North Haven police department in the form of statements and photo boards."

Now, similar question:  You agree with respect to this case if Detectives Coppola and Rodriguez were told from their superiors at the New Haven police department to cease all investigation, that an appropriate response to that, if they felt that that was an illegal order, was to go to the state's attorneys office, correct?

A.    Yes.

Q.    And in that regard, in your opinion, Detectives Coppola and Rodriguez were appropriately dealing with what they felt was an investigation which was being thwarted by --

A.    I believe so.

Q.    By going to the state's attorneys office, if they thought the New Haven police department were improperly thwarting an investigation, they were doing the right thing?

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____13_____ day of ___August___ , 20 _04_

_____
NOTARY PUBLIC
LARRY DORFMAN

My Commission Expires:

JANUARY 31, 2007