# EXHIBIT G

Case 3:01-cv-00592-MRK   Document 131-7   Filed 10/12/2004   Page 1 of 11

```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
--------------------------------x
EDWIN RODRIGUEZ,

            Plaintiff,

        -versus-              : No. 3:01CV392(SRU)
                                       (lead)
THE CITY OF NEW HAVEN, ET AL,

            Defendants.
--------------------------------x
STEPHEN COPPOLA,

            Plaintiff,

        -versus-              : No. 3:01CV813(SRU)
                                      (member)
MELVIN WEARING, ET AL,

            Defendants.
--------------------------------x

    DEPOSITION OF:  KEITH WORTZ

    DATE:  July 23, 2004 - 10:46 a.m.

    HELD AT:  Jacobs, Grudberg, Belt & Dow
              350 Orange Street
              New Haven, Connecticut 06503




    Reporter: LARRY DORFMAN, LSR #0067
         SANDERS, GALE & RUSSELL
            437 Orange Street
       New Haven, Connecticut 06511
             (203) 624-4157
```

Barndollar about him.

Q. Could it have been the other agent whose name you don't recall? You know what? Withdrawn.

Did you make any complaints about Coppola to anyone in the FBI?

A. I made, well, I wouldn't necessarily call it a complaint. They asked me what had occurred from the beginning of when I was asked to help North Haven up until current day. I explained to them everything I knew, conversations I had, information people provided to me. And the only thing that would be I think remotely a complaint was specifically about Steve Coppola's brother, Billy Coppola. I had a run in with Bill. I had a run in with Billy Coppola. But complaint about Steve Coppola, I indicated his actions, things which were being related to me as to his activities, which I was very dissatisfied with. But specific complaint, no.

Q. What activities do you mean?

A. People within the department were coming back to me, as far as people on the streets of Fair Haven, street people, thugs, gang members, were coming back to me and relating

information that they claimed that Steve Coppola was telling to them, and to me, it was not only false, but it was very insulting and false information, which I felt was a personal attack on myself. And I did make a complaint to internal affairs in respect to that.

    Q.    Okay.

    MS. PAINE: Do we have a time? Can we have a timetable on when the complaint was made to internal affairs?

    MR. MARTINEAU: If he knows.

    MS. PAINE: If he knows, right.

    THE WITNESS: I don't recall.

BY MR. PHILLIPS:

    Q.    Now, with respect to conversations you had with members of the North Haven police department, what did you tell them about the Cusick homicide?

    A.    About the Cusick homicide, I told them -- I steered them in the direction of people I spoke to and they could pursue and speak to them directly, other names of people involved in a gang known as the Elm City. I had a lot of documents about that gang and various people within that gang, what their ranks were, their

associations and the areas in which they hung out, congregated, sold drugs, that kind of thing, and provided them with all that information. I also indicated to them that a guy by the name of Ray Martinez was interviewed by Steve Coppola and Eddie Rodriguez, and that Eddie Rodriguez had indicated that Ray Martinez provided them with information that they could solve the case with.

    Q.    All right. If I understand you correctly, in March of '97, Captain Sullivan orders you not to do anything else with the Cusick homicide and not to assist North Haven, correct?

    A.    Correct.

    Q.    Sometime after that, you spoke to John Minardi, who was in internal affairs, about what you perceived to be an unlawful order, correct?

    A.    Correct.

    Q.    You later found out from John Minardi nothing is going to happen about that complaint, correct?

    A.    Correct.

    Q.    Then you went to Cecilia Wiederhold with the state's attorneys office; is that correct?

    A.    Correct.

    Q.    She referred you over to Michael Dearington, and you voiced your concerns to Michael Dearington, correct?

    A.    Correct.

    Q.    Was it after you met with Dearington that you informed members of the North Haven police department about what you knew?

    A.    I'm not sure of the time line. I know I spoke with North Haven on several occasions. It wasn't just on one occasion, it was multiple times. They called me, I called them. They came to New Haven, met with me. I know one time they asked if I could get together with them and I actually happened to be at University of New Haven. They met me out that way. We had numerous conversations.

    Q.    So going back to paragraph 12 on page 4, you say that the Defendant Melvin Wearing was angry with you.

    A.    Yes.

    Q.    How did he express that anger to you?

    A.    Well, I scored high on the detective test. I got passed over repeatedly by a lot of people. I scored number one in the SWAT tryouts,

the tactical team, and it was my understanding that the people that would be most qualified to be on that tactical team would be on that tactical team. I was not chosen. People who flunked the SWAT tactical team tryouts were put on the team. Let me see, what else?

I was removed from the state police gang task force and put back into patrol division. I was portrayed in the department as being a crybaby. I was denied overtime, told to go home while other members of task forces had overtime.

Then another time I was in training, and a significant amount of people were wearing jeans and casual clothes on a day we were doing a firearms training, which was common to wear jeans because you have to lay down, kneel on a firing range. This particular day, it was snowing, sleeting, raining, there were puddles. But I was written up for disciplinary action for not wearing a suit. And despite the fact that at least a half dozen people were wearing casual clothes, I was the only one written up for that, wearing casual clothes. As a matter of fact, one person wasn't even carrying the right gun, and

that person wasn't written up for disciplinary action.

I was transferred from one neighborhood to the next. Complaints I had made about what was going on in the department fell on deaf ears, and when I did speak personally to Mel Wearing in the presence of my union president, Louis Cavaliere, I spoke beginning to end, and after I finished speaking to Mel Wearing beginning to end about everything that was going on, he told me that certain things are simply administrative issues and that I don't understand administrative issues and he wasn't going to explain them to me. And that as far as the other activities going on in the department, that I should just handle those in the locker room like in the old days, just duke it out, beat each other up. And that if I wasn't able to deal with the matters at hand, then maybe I should consider a different career and turn my badge in. And he indicated that he was fully aware of everything and that IA had brought this information to his attention and that he discussed it with Brian Sullivan, and Brian Sullivan assured him that this was my -- my complaints were not accurate and baseless.

Q. Did Chief Wearing tell you that you shouldn't have gone to the state's attorneys office?

A. I don't know if it was in that conversation or in one of the times I appeared before him for the disciplinary or when he decided to send me home, he had indicated that he was upset that I took this matter outside the department and it should have been handled internally.

Q. Did you ever hear Chief Wearing say, "If anyone has a complaint, it stays within the department," or words to that effect?

A. I don't recall as I sit here today. I wish I could recall the specific words that Chief Wearing used. He was very careful with his wording. But I had subsequent conversations with Mel Wearing where he clearly voiced his opinion about me taking it outside to the state's attorneys office.

Q. What did he say?

A. I don't remember the exact words, but it was something to the effect of he said something to the effect of, "You are not a whistle blower, you are a piece of shit." And

do you have a problem with what they did if that's what happened?

A.   If they had gone to the state's attorneys office after Sullivan had ordered them not to -- am I understanding it correctly?

Q.   After Sullivan had ordered them to cease and desist, they went to the state's attorneys office and said, "There has been a murder.  This is the information we have developed.  This is what we have done.  We were now told to stop.  What should we do?."  Do you have a problem with that?

A.   Well, I would say they acted accordingly due to the fact that any order to cease and desist from an investigation, if they were ordered in the manner in which I was ordered to cease and desist, I think their actions would be appropriate.

Q.   Okay.  And in fact timely?

A.   Correct.

           MR. MARTINEAU:  Could we go off the record?

           MS. PAINE:  Okay.

           (Recess:  1:13 to 1:15 p.m.)

BY MS. PAINE:

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___13___ day of ___August___, 20_04_.

_____
NOTARY PUBLIC
LARRY DORFMAN

My Commission Expires:

JANUARY 31, 2007