UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDWIN RODRIGUEZ, | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| THE CITY OF NEW HAVEN, AND IN THEIR | : | |
| INDIVIDUAL AND OFFICIAL CAPACITIES, | : | CONSOLIDATED |
| MAYOR JOHN DESTEFANO, CHIEF OF POLICE | : | NO.301 CV592(MRK)(Lead) |
| MELVIN H. WEARING, CORPORATION COUNSEL | : | NO.: 3:01 CV813(MRK)(Member) |
| THAYER BALDWIN, CHIEF ADMINISTRATIVE | : | |
| OFFICER JAMS HORAN, CAPTAIN BRYAN D. KEARNEY, | : | |
| LIEUTENANT JOHN MINARDI, PATROL OFFICER | : | |
| KEITH WORTZ, | : | |
| Defendants | : | |
| | : | |
| STEPHEN COPPOLA, | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| MELVIN WEARING, BRYAN KEARNEY, | : | |
| JOHN MINARDI AND KEITH WORTZ AND | : | |
| THE CITY OF NEW HAVEN | : | OCTOBER 8, 2004 |

## PLAINTIFF RODRIGUEZ' LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Local Civil Rule 56(a)(2), plaintiff submits the following response to defendants' Statements of Facts Not in Dispute, and submits his statement of Disputed Issues of Material Fact in support of his opposition to defendants' Motions for Summary Judgment.[1]

---

[1] All referenced exhibits are appended to plaintiff's Notice of Filing Exhibits in Support of Opposition to Summary Judgment, filed this day.

I.    **RESPONSE TO CITY DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT**

1.    Denied insofar as when the Cusick murder occurred, Nicholas Pastore was Chief of Police.  Chief Pastore retired some time in 1997 and was succeeded by Chief Wearing.  (Ex. A, Kendall tr. at 19-20.)

2-6.    Admitted.

7.    Denied insofar as plaintiffs testified they were never formally assigned to the Cusick case.  (E.g., Ex. E, Coppola depo. at 52.)

8-10.    Admitted.

11.    Denied.  There is a genuine issue of material fact as to whether Chief Wearing was told of the existence of the statement by Captain Sullivan, and then ordered the investigation stopped.  (Ex. A, Kendall depo. at 45-47 (testifying that the stop investigation meeting took place in March 1998, that Rodriguez and Coppola explained that they had information to get a search warrant, that Captain Sullivan announced he was going down to the Chief's office to talk to the chief, that Sullivan walked out and left the Detective's Division, heading toward the Chief's office, that the remaining four officers waited there for Sullivan for five or ten minutes, that Sullivan returned and announced per order of the chief to hold off on the investigation, and that Sullivan said this "coarsely", as if he were upset); Ex. B, Rodriguez depo. at 25 (Sullivan said "chief" ordered stop); Ex. D, Sullivan 5-12-00 statement at 35-38 (Wearing ordered the New Haven investigation stopped)).

12-13.    Admitted.

14-16.    Denied for the reasons and on the evidence set forth in paragraph 12 above.

17.    Denied.  Coppola and Rodriguez had every reason to believe the chain of command would not respond.  Coppola did not speak to Wearing regarding Sullivan's stop

order because "Sullivan said he gave the order".  (Ex. E, Coppola depo. at 118.)  He did not go to Assistant Chief Douglas MacDonald because Wearing, Sullivan and MacDonald "were best friends.  They golfed together, they drank together, they ate lunch together, they smoked cigars together. . . .  It was no one I could have gone to in that place."  (Id. at 119.) Rodriguez states, "The chief gave the direct order to give to Sullivan to give to us.  So why should I go to him?"  (Ex. B, Rodriguez depo. at 31; 75.)

    18-21.  Admitted.

    22-31.  Admitted, except insofar as these statements are denied by plaintiff Coppola.

## II.    RESPONSE TO RULE 56(a)(1) STATEMENT OF KEARNEY DEFENDANTS

    1-31.   Plaintiff responds as set forth above to paragraphs 1-31 of the Kearney defendants' Rule 56(a)(1) Statement.

    32-39.  Admitted.

    40.    Denied.  There is a genuine issue of material fact as to whether defendant Kearney knew that the IA investigation and the IA report he authored were intended to retaliate against plaintiffs for their speech and nonetheless continued the investigation and authored the report without mentioning this knowledge.  Kearney told Minardi that "they had compiled a list . . . showing who did what wrong, and he said that the chief's list was the longest one."  (Ex. F, Minardi depo. at 37.)  Coppola and Rodriguez were apparently on the list -- during the IA investigation.  Also, within weeks of Coppola's giving his statement, Kearney said to Coppola, "If you didn't go outside the department, you wouldn't be in trouble."  (Ex. E, Coppola depo. at 101.)

## III.    DISPUTED ISSUES OF MATERIAL FACT

    41.    There is a genuine issue of material fact as to whether Sullivan or Wearing gave the "stop investigation" order.  Rodriguez and Coppola sat down at the table and

started to explain that they had information to get a search warrant.  (Id. at 45-46.)  After

Coppola described their evidence, Sullivan said, "You will cease this investigation per the

chief, and give us all the documents and everything you have on the case."  (Ex. B,

Rodriguez depo. at 25.)[2]  At the time, Melvin Wearing was Police Chief.  (City Defs.

56(a)(1) statement ¶ 1.)  Thus, to Rodriguez  "the chief" meant Wearing.  (Ex. B, Rodriguez

depo. at 25.)[3]

     Captain Sullivan's statement to the IA investigators confirms the factual dispute:

Sullivan stated that Wearing ordered him to stop the investigation, to give the statement to

North Haven, and to let them continue to investigate.  (Ex. D, Sullivan statement at 33.)

Sullivan explained to the Chief that there was a possibility the Cusick killing occurred in

New Haven, in which case New Haven should have continued its investigation.  (See id. at

34-35, 37-38.)  Wearing nonetheless ordered the New Haven investigation stopped.  (Id. at

35.)  Sullivan had never before received an order to stop an investigation or to stop

assisting another department.  (Id. at 36.)

     42.    It is undisputed that plaintiffs' reporting of their concerns to the State's

Attorney's Office was protected speech.  Within a few days after the stop order, Rodriguez

and Coppola went to see Dennis Kelly, an inspector at the State's Attorney's office.  (Ex. E,

Coppola depo. at 110-12.)  Coppola told Kelly how the investigation had progressed and

---

[2] Sergeant Kendall's trial testimony regarding this encounter varies somewhat from that of Rodriguez and Coppola.  (See Ex. A, Kendall tr. at 45-47.)  Kendall stated that after listening to Coppola, Sullivan walked out of the meeting, heading in the direction of the Chief's office.  He was gone for about five minutes, and it was not until he came back that he gave the stop order.  At that time, he was visibly upset.  Kendall confirms that Sullivan said the investigation was to be stopped per order of the Chief.  (Id.)

[3] In addition, Chief Wearing testified that he was aware that his subordinates during his tenure sometimes relayed orders by saying, "this is what the chief wants".  (Ex. C, Wearing depo. at 36.)  He was not aware of anyone ever using that authority improperly.  (Id.)

how Sullivan had cut them off.  (Id. at  112.)  Kelly told Coppola and Rodriguez, "Secure what you have in your desk, and just do what you are told.  I'll take it from here."  (Id.)

43.     There is a genuine issue of material fact as to whether plaintiffs were following Kelly's instructions in retaining the evidence and abiding by Sullivan's stop order. Per Kelly's instructions, Coppola secured the photo array and a copy of the statement.  (Id. at 112-14.)  Coppola delivered this evidence to the State's Attorney's office, at the request of an inspector there, before the police IA investigation began.  (Id. at 97-98, 122-24.)

44.     There is a genuine issue of material fact as to whether Chief Wearing retaliated against plaintiffs for their speech, either to shift blame from himself or simply to punish them for going outside the department.  As stated in Paragraph 41 above, there is a genuine issue of material fact as to whether Wearing himself gave the stop order.   There is also competing evidence that Wearing was angry at plaintiffs for interfering in Sullivan's career.  Coppola testifies that when Captain Sullivan was released at one point, Wearing stopped Coppola in the basement and said, "Are you happy now?"  (Ex. E, Coppola depo. at 100.)

Third, there is evidence that Wearing regarded plaintiffs' decision to go outside the department -- however necessary and correct it was -- as a personal affront, and intended to make them pay for it.  Under cross-examination at the Sullivan trial, Wearing admitted he would have preferred Rodriguez and Coppola to stay "inside" the department.  (Ex. H, Wearing tr. at 95-98.)

Wearing's desire to retaliate against the officers who aired the department's dirty laundry is apparent from his inappropriate involvement in the IA investigation.  From the outset, Chief Wearing did not give his own IA team full information regarding the case.  (Ex. F, Minardi depo. at 27.)  He did not tell them that Kendall and Sullivan and Attorney Jack

Kelly had begun an investigation themselves. (Id.) He did not tell them that Kendall, Sullivan and Kelly had already taken a statement from a property clerk, nor did he give them that statement. (Id. at 27.)

Wearing demanded to be kept updated and ordered no key interviews be taken without his knowledge. (Ex. F, Minardi depo. at 25-26.) He also appears to have picked as IA staff officers he felt he could manipulate and removed officers he felt he could not. Minardi testified that Wearing deliberately scheduled a key interview when Minardi was absent, and ultimately removed Minardi from the team after repeated clashes with him. (Ex. F, Minardi depo. at 27, 29, 63, 90.) Wearing referred to one of Minardi's memoranda to the IA file as "a lie". (Ex. C, Wearing depo. at 37-38.) Wearing nonetheless vehemently denies that he interfered in the investigation: "I would never hinder or stop an investigation. But I certainly would want to be apprised of what is going on with a member of the department. So the IA supervisor would automatically come to me and advise me of what's going on. And I always say, let's see where it takes us." (Id. at 29.)[4]

Moreover, Wearing was from the outset a "party of interest" in the IA investigation, because Rodriguez and Coppola said Sullivan told them the Cusick case was being stopped "per order of the chief". (Ex. F, Minardi depo. at 38.) Although he was himself implicated, Wearing manipulated the investigation by ordering who should be interviewed first. (Id. at 46.)[5] The Chief interfered with the investigation in a number of ways, including

---

[4] Minardi testifies that Wearing interfered in a previous IA investigation into the conduct of a police captain. (Ex. F., Minardi depo at 85-86.) Wearing again denies that he would ever do such a thing: "Q. So if I understand you correctly, you're saying during your tenure as chief, you're saying you never decided any investigation should not go forward? A. That's correct." (Ex. C, Wearing depo. at 29.)

[5] The IA investigators took the statements of Rodriguez, Coppola and Rogers "back to back" but did not do so with Sullivan and Kendall. (Ex. E, Coppola depo. at 83.)

threatening the IA team: "one of the other things he used to use as a favorite threat of his was, it never worked, but he used to call us in and say stuff like, "You know you are still going to have to work for me even after the politicians are gone."  (Id. at 27-28.)  Minardi felt that Wearing's improper influence impeded his ability to get answers in the investigation.  (Id. at 81.)

Wearing also initially refused to give a statement himself when asked.  (Id. at 46-47.)

There is also evidence that Wearing had decided what the results of the investigation should be before it was done.  Captain Kearney told Minardi that "they had compiled a list . . . showing who did what wrong, and he said that the chief's list was the longest one."  (Ex. F, Minardi depo. at 37.)  Every day Minardi or Kearney reported their progress to Chief Wearing.  (Ex. E, Coppola depo. at 99.)  Sullivan was in Wearing's office every night when Coppola came in.  (Id. at 100.)  At this time, Sullivan was not talking to Coppola; Wearing did not say hello to Coppola or Rodriguez.  (Id.)

During the IA investigation, indeed within weeks of Coppola's giving his statement, Kearney said to Coppola, "If you didn't go outside the department, you wouldn't be in trouble."  (Id. at 101; see also Ex. F, Minardi depo. at 30-32.)

The stories of Keith Wortz and John Minardi also demonstrate Wearing's inclination to punish anyone who went "outside" the department.  In 1997, Detective Keith Wortz was providing the North Haven Police Department with information regarding the Cusick murder.  (Ex. G, Wortz depo. at 34.)   Then in March 1997, Captain Sullivan ordered Wortz not to do anything else to assist North Haven.  (Id.)  Wortz was troubled by this order and eventually went to the State's Attorney's office with his concern.  (Id. at 34-35.)  Wearing retaliated in a number of ways, including passing Wortz over for promotion, reprimanding him where others were not being reprimanded, and refusing seriously to entertain his

complaints.  (Id. at 36-38.)  Chief Wearing indicated he was upset that Wortz took the matter outside the department, saying something to the effect of, "You are not a whistleblower, you are a piece of shit."  (Id. at 38.)

Similarly, Minardi described a pattern of being passed over for promotions and sought after assignments, being placed in undesirable assignments, and having Wearing ask others if they could "get [Minardi] on anything."  (Ex. F, Minardi depo. at 31-32.)

45.    There is a genuine issue of material fact as to whether defendants would have disciplined plaintiffs absent their speech.  Chief Wearing admits that a police officer who felt the chain of command was not responding could go to the Board of Police Commissioners, the Mayor's Office, and the State's Attorney.  (Ex. C, Wearing depo. at 32-33.)  (This statement is supported by a rough consensus among the officers that going to the State's Attorney was the right thing to do under the circumstances.  (E.g., Ex. F, Minardi depo. at 102-03; Ex. G, Wortz depo. at 67.)

Coppola and Rodriguez had every reason to believe the chain of command would not respond.  Coppola did not speak to Wearing regarding Sullivan's stop order because "Sullivan said he gave the order".  (Ex. E, Coppola depo. at 118.)  He did not go to Assistant Chief Douglas MacDonald because Wearing, Sullivan and MacDonald "were best friends.  They golfed together, they drank together, they ate lunch together, they smoked cigars together. . . .  It was no one I could have gone to in that place."  (Id. at 119.)  Rodriguez states, "The chief gave the direct order to give to Sullivan to give to us.  So why should I go to him?"  (Ex. B, Rodriguez depo. at 31; 75.)[6]

---

[6] Before the IA investigation began, the State's Attorney's office contacted Coppola and Rodriguez and asked them to explain why the Cusick murder investigation had stalled. (Ex. E, Coppola depo. at 122-24.)  Inspector Reardon of the State's Attorney's office at that time took statements from Coppola and Rodriguez and took the photo board.  (Id. at 97-98,

Moreover, other officers who acted similarly were not disciplined. John Minardi testifies that he went outside the chain of command regarding the investigation of a police captain in the late nineties, and that although Wearing knew it, he was not disciplined for it. (Ex. F, Minardi depo. at 29-32.) Wearing also admitted that Wortz went outside the chain of command in reporting Captain Sullivan's stop order to him on the Cusick case to the State's Attorney's office. (Ex. C, Wearing depo. at 14.) Nonetheless, Wortz was not disciplined for this action -- indeed he was commended. (Pl. Coppola Mem. in Opp. Ex. G.)

Finally, Dennis Kelly, the inspector at the State's Attorney's office had <u>told</u> Coppola and Rodriguez, "Secure what you have in your desk, and just do what you are told. I'll take it from here." (Ex. E, Coppola depo. at 112.)  Captain Kearney was aware of this instruction, as was Chief Wearing when he issued the reprimands.[7]

Similarly, there is a genuine issue of material fact as to whether detectives regularly kept original investigatory materials in their desks without being reprimanded. Detectives commonly kept photo arrays and statements in their desks. A photo array is not generally placed in evidence right away. (Ex. B, Rodriguez depo. at 73; Ex. E, Coppola depo. at 115.) It was common practice for detectives to keep photo arrays secured in their desks until an investigation was complete. (<u>Id.</u> at 115-16; <u>see</u> <u>also</u> Ex. A, Kendall tr. at 113; Ex. D, Sullivan statement at 68-69 (originals should go in the record room but sometimes they

---

122-24.)  Later, when the IA investigation had begun, State's Attorney Michael Dearington advised them that he did not want anyone in the police department to know about the statements for fear of some type of retaliation. (<u>Id.</u> at 92.)
[7] This instruction was confirmed to the IA investigators on November 30, 2000, when State's Attorney Michael Dearington wrote a letter to Thayer Baldwin, Corporation Counsel, indicating that plaintiffs had come to his inspector with their concerns. Even more importantly, Attorney Dearington wrote that his inspector had advised the detectives to follow the direction of their supervisor and retain copies of their paperwork. (Pl. Coppola Opp. Mem. Ex. F (Dearington letter); Kearney Def. Mem. attachment, Final IA report, at 65-66.)

find them in detectives' desk drawers, if that happened, they would just tell the detective to put it in the record room where it belonged).)

Rodriguez and Coppola saw a box removed from Wearing's office which contained original cassettes, statements, and photo boards on two unsolved murders which had occurred nine years previously.  (Ex. B, Rodriguez depo. at 73; Ex. E, Coppola depo. at 116-17.)  Coppola still frequently sees photo boards kept in other officers' desks.  (Id. at 118.)

46.     There is a genuine issue of material fact as to whether Chief Wearing was the policy-making official responsible for discipline in this case.  Wearing stated, "I am the chief and I give the direction in the department."  (Ex. C, Wearing depo. at 9.)  He was responsible for the overall operation of the department, including disciplinary actions and overall supervision.  (Id. at 5.)  He had the sole authority to begin an IA investigation.  (Id. at 12.)  Wearing stated, "There's no investigation that's lodged in the department in terms of an internal affairs investigation without my authority.  There's no independent investigation carried out without my acknowledgment."  (Id. at 10.)

The Board of Police Commissioners is responsible for charges preferred to them by the Chief.  (Id. at 9, 12.)  These cases include violations of police department policy.  (Id. at 13-14.)  In this case, however, charges were not preferred to the Board of Commissioners.  Moreover, despite his conflict of interest, there is evidence that Wearing manipulated the investigation, and regarded information he deemed unhelpful as a lie.  (See  Ex. C, Wearing depo. at 37-38; Ex. F, Minardi depo. at 27-28, 38, 46.)  And again, despite the conflict, Wearing himself issued the reprimands.  (City Defs. Rule 56(a)(1) statement ¶ 24.)

47.     There is a genuine issue of material fact as to whether defendant Kearney knew that the IA investigation and the IA report he authored were intended to retaliate

against plaintiffs for their speech and nonetheless continued the investigation and authored the report without mentioning this knowledge.  Kearney told Minardi that "they had compiled a list . . . showing who did what wrong, and he said that the chief's list was the longest one."  (Ex. F, Minardi depo. at 37.)  Coppola and Rodriguez were apparently on the list -- during the IA investigation.  Also, within weeks of Coppola's giving his statement, Kearney said to Coppola, "If you didn't go outside the department, you wouldn't be in trouble."  (Ex. E, Coppola depo. at 101.)

THE PLAINTIFF,
EDWIN RODRIGUEZ

By /s/ Rosemarie Paine
      Rosemarie Paine (ct15694)
      JACOBS, GRUDBERG, BELT & DOW, P.C.
      350 Orange Street
      New Haven, CT 06503
      Telephone No.: 203-772-3100
      Facsimile No.: 203-772-1691
      e-mail: rpaine@jacobslaw.com

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed first class, postage prepaid this 8th day of October, 2004 to:

Jonathan H.  Beamon
Office of the Corporation Counsel
City of New Haven
165 Church Street
New Haven, CT 06510

Paul A. Morello Jr., Esquire
Donovan & Morello
154 West Street
Building 3
Cromwell, CT 06416

R. Edward Phillips, Esquire
Miller & Phillips
One Union Plaza
Second Floor
New London, CT 06320

/s/ Rosemarie Paine
Rosemarie Paine